679 F.2d 541
 28 Fair Empl.Prac.Cas. 1491,
28 Empl. Prac. Dec. P 32,679
 Carl W. STOTTS, Individually and on behalf of all others
similarly situated, Plaintiffs-Appellees,
and
Fred L. Jones, Plaintiff-Appellee,
v.
MEMPHIS FIRE DEPARTMENT; Robert W. Walker, City of Memphis,
and JosephSabatini, Defendants-Appellants,
and
Firefighters Local Union 1784, Defendant-Intervenor-Appellant.
 
 Nos. 81-5348, 81-5349.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 15, 1981.
Decided May 7, 1982.
 Clifford D. Pierce, Jr., City Atty., Louis P. Britt III, McKnight, Hudson, Lewis & Henderson, Allen S. Blair, James R. Newsom III, Hanover, Waldh, Jalenak & Blair, Memphis, Tenn., for defendants-appellants.
 Richard B. Fields, Ratner & Sugarmon, Memphis, Tenn., for plaintiffs-appellees.
 Before KEITH and MARTIN, Circuit Judges, and DUNCAN,* District Judge.
 KEITH, Circuit Judge.
 
 
 1
 This case presents questions regarding the entry and modification of a consent decree in an employment discrimination case. In 1977, Plaintiff-appellee Carl Stotts filed a class action against the City of Memphis, alleging that the Fire Department's hiring and promotion policies were racially discriminatory. After three years of discovery and intensive negotiations, the Stotts suit was settled by a consent decree in 1980 ("1980 Decree"). No trial was held. The 1980 Decree was intended to supplement an earlier consent decree entered in 1974 which affected employment practices in all divisions of the Memphis city government. The 1980 Decree provides for back-pay awards and an affirmative action plan containing specific hiring and promotion goals. The decree does not specifically address the effect layoffs would have on these affirmative action goals.
 
 
 2
 In 1981, the City of Memphis announced that city-wide layoffs were necessary to alleviate an unanticipated economic crisis. The proposed layoffs in the Fire Department threatened to frustrate the purpose of the decrees and the progress accomplished under them. Minority employment in the Fire Department would have been devastated by the proposed layoffs. Plaintiff Stotts filed a motion to restrain the City of Memphis from implementing the layoff proposal in a manner which affected minority firemen. The district court found that the proposed layoffs were an unanticipated change in circumstance not contemplated by the consent decrees. Accordingly, the court modified the decrees and enjoined the proposed layoffs and demotions of minority firemen. We affirm.
 
 I. FACTS
 
 3
 In 1974, the United States Department of Justice ("Government") instituted an action against the City of Memphis ("City") under Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981,[1] the Fourteenth Amendment, and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq. The complaint alleged that the Fire Department and various other City divisions had engaged in a pattern or practice of race and sex discrimination in hiring and promotions. The City initially denied the allegations. Later in 1974, however, it agreed to settle the litigation with a consent decree ("1974 Decree").[2]
 
 
 4
 The motivation for the 1974 Decree was the desire to remedy past discrimination and avoid the delay and expense of further litigation. In the decree, the City did not admit to any misconduct. The City did acknowledge, however, that its employment practices may create an inference of racial and sexual discrimination.
 
 
 5
 The purpose of the 1974 Decree is to remedy any disadvantage to blacks and women which may have resulted from past discrimination. Subject only to the availability of qualified applicants, the City agreed to undertake the "goal of achieving throughout the work force proportions of minority and female employees in each job classification approximating their respective proportions in the civilian labor force." The decree established interim hiring goals for each of the City's divisions. The interim goal affecting the Fire Department required that minority employment in the uniformed positions increase by 5% before July of 1976. The decree also required the City to "engage in affirmative recruitment activities consistent with their obligation to take all reasonable steps to reach the goals set forth" in the decree. Specific numerical hiring ratios would be established if the City failed in its good faith attempt to meet the interim hiring goal.
 
 
 6
 The 1974 Decree did not establish specific minority employment goals for the ranks above firefighter. However, the decree acknowledged the need to increase substantially the number of minorities in supervisory positions. In fact, the decree committed the City to "making significant progress in increasing the number of black and female supervisory personnel." Numerical promotional goals could be imposed if the City's performance during the preceding fiscal year did not satisfy its obligations under the decree.
 
 
 7
 On February 16, 1977, Carl Stotts, plaintiff-appellee, filed a class action suit against the Memphis Fire Department. His complaint alleged that the Fire Department's hiring and promotion policies violated Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and 42 U.S.C. § 1983.[3]
 
 
 8
 The Pioneers, a group of approximately 70 minority Memphis firemen, filed a motion to intervene in the Stotts case. The trial court denied the Pioneers' motion to intervene, but certified the case as a class action. During the following months, the Stotts case received extensive attention in the local media. The press coverage included several articles describing the Stotts case and its effect on the Fire Department.
 
 
 9
 On June 19, 1979, Fred Jones, plaintiff-appellee, filed an action against the City, alleging that the Fire Department had denied him a promotion solely because of his race. The Jones and Stotts cases were consolidated in September. On September 27, District Judge McRae set a trial date for the Stotts case but, nonetheless, encouraged the parties to settle the action.
 
 
 10
 In December, Plaintiffs-appellees Stotts and Jones ("Plaintiffs") filed a motion for a temporary restraining order ("TRO") to enjoin the City from making promotions within the Fire Prevention Bureau. The Plaintiffs stated they would be irreparably harmed if the scheduled promotions occurred. As proposed, the promotions would fill certain positions and prevent minorities from acquiring the experience necessary to qualify them for supervisory positions. The City opposed the motion, arguing that the promotions were necessary for the efficient operation of the Fire Department. The creation of acting or temporary positions would create instability within the department. The City stated emphatically, "We do need to make the promotions." The trial court granted the TRO after finding that, "there would be irreparable harm if promotions were granted that were not consistent with the rights of the plaintiffs."
 
 
 11
 On January 17, 1980, the City appeared before Judge McRae and stated that settlement negotiations were continuing. On February 20, 1980, both the City and Plaintiffs appeared before the court and stated that the settlement was complete "except for about five different things." Five days later, the parties again appeared before the court and stated that negotiations concerning the settlement were continuing despite some difficulties concerning the affirmative relief and monitoring sections of the proposed settlement.
 
 
 12
 Finally, on April 25, 1980, the parties announced that they had reached a settlement. The settlement consisted of an affirmative action plan embodied in the 1980 Decree. The 1980 Decree contained hiring and promotion goals. The decree was the final resolution of the consolidated Stotts case and applied to all class members. The parties informed the court that they only sought preliminary approval of the decree and the court's consent to post the decree for 15 days in the Memphis Fire Stations for comment. Counsel also stated that he thought the Firefighters Local Union 1784 ("Firefighters Union") might object to the decree.
 
 
 13
 The purpose of the 1980 Decree was to remedy the past hiring and promotions practices of the Memphis Fire Department relative to minorities. The 1980 Decree was intended to parallel and supplement the relief provided in the 1974 Decree. The decree reaffirmed the City's commitment to achieve the long-term goal of increasing minority representation in each job classification to levels approximating the level of minority representation in the Shelby County labor force. The 1980 Decree also established specific hiring and promotion goals. The hiring goal stated that qualified minorities should fill at least 50% of all vacancies. The promotional goal indicated that qualified minorities should receive 20% of the vacancies. The promotional goal was adopted to "insure as quickly as practicable the attainment of (the) long range goal." Back pay in the amount of $60,000 was also awarded to class members in varying amounts according to their length of service. In addition, the decree required the trial court to retain jurisdiction to make "such further orders as may be necessary or appropriate to effectuate the purposes of this decree."
 
 
 14
 Neither the Firefighters Union nor any class member filed an objection to the decree during the 15 day period. On May 12, 1980, however, a group of eleven non-minority firemen objected to the entry of the 1980 Decree and filed a motion to intervene. These proposed intervenors filed on behalf of themselves and allegedly all other non-minority firemen. The non-minority firemen were not, however, representatives of the Firefighters Union, the union representative of Memphis firemen.
 
 
 15
 The non-minorities asserted that the promotional goals contained in the 1980 Decree operated as "reverse discrimination against the non-minorities." The non-minorities also asserted that less burdensome alternative relief for minority employees was available which did not shift discrimination to non-minority employees. These alternatives included the creation of additional positions for promotion, organizational restructuring of the Memphis Fire Department, constructive promotion,[4] and the payment of monetary damages to non-minority employees affected by the decree.
 
 
 16
 On May 16, 1980, the court held a hearing. The court heard objections to the 1980 Decree and the motion to intervene. No class member filed an objection to the decree. The proposed intervenors indicated that the only immediate relief they sought was a delay in the approval of the promotion section of the decree. Allegedly, additional discovery and expert statistical analysis were necessary before concrete alternative remedies for the past discrimination minorities experienced could be presented. The proposed intervenors' position was that the decree should not have any affect on the promotional opportunities of incumbent employees. The proposed intervenors did not argue that the relief provided in the 1980 Decree unduly burdened a readily identifiable, small group of incumbent employees. Nor did the proposed intervenors argue that the decree was the product of collusion.
 
 
 17
 The court denied the proposed intervenors' motion to intervene after finding that the proposed intervenors adopted a "wait-and-see" approach to the litigation. The alternatives suggested by the proposed intervenors were also considered and rejected. Continuation of the TRO would unduly hamper the functioning of the Fire Department. The court also opined that it could take judicial notice that the City's past employment practices were racially discriminatory based on evidence contained in the record. Ultimately, the court determined that the 1980 Decree was "reasonable".
 
 
 18
 On May 4, 1981, Joseph Sabatini, Director of Personnel for the City, publicly announced a personnel reduction in non-essential services in all divisions of the City government. The proposed layoffs were the first in the City's history. The City's layoff policy was based on an individual's city-wide union seniority, that is, the length of his tenure as a city employee. The seniority system was mentioned in the 1974 Decree and is incorporated in the City's memorandum of understanding with the Union.
 
 
 19
 A deficit in the City's projected operating budget prompted the proposed layoffs. The deficit was caused by an unanticipated decrease in the general revenue funds from the 1980-81 fiscal year and an increase in operating costs. Plaintiffs were not given an opportunity to review the City's layoff policy before it was announced publicly. The Mayor had ultimate authority to determine which job classifications within the city government were affected by the new layoff policy.
 
 
 20
 On May 4, 1981, Plaintiffs obtained a TRO restraining the City from laying off or reducing in rank any minority employee in the Memphis Fire Department. The parties consented to the intervention of the Firefighters Union in the Stotts case the next day.
 
 
 21
 An evidentiary hearing was held on May 8 to consider Plaintiffs' request for a preliminary injunction. The court made several determinations. First, the announced layoffs and demotions were an unanticipated changed circumstance not provided for in the text of the decree. Second, the 1980 Decree was designed to correct the effects of the City's hiring and promotion practices. Finally, the court concluded that the proposed layoffs would have a devastating and retrogressive effect on minority employment and the affirmative action accomplished pursuant to the consent decrees. Most minorities above the rank of private had accrued little seniority in their respective ranks. Consequently, nearly 60% of all firemen affected by the demotions would have been minorities. Moreover, fifty-five percent of all minority Lieutenants and 46% of all minority Drivers would either have been laid off or demoted if the announced layoffs had occurred.
 
 
 22
 Based on this and other evidence in the record,[5] the court ruled that the layoff policy would have a discriminatory impact and the seniority system was non-bona fide.[6] Subsequently, the court modified the consent decree to minimize the disruptive effect the layoffs would have on the efforts to achieve the goals of the decree. The court enjoined the City from applying the layoff policy based on seniority insofar as it would decrease the percentage of black Lieutenants, Drivers, Inspectors, and Privates employed in the Memphis Fire Department. The City and the Union appealed.
 
 
 23
 On June 22, 1981, Plaintiffs filed a motion requesting the court to enjoin the proposed layoffs and demotions of minority employees in five additional positions. After a hearing on the motion, the court expanded the preliminary injunction to include three of the five positions.
 
 
 24
 Both the City and the Union filed a motion with the trial court to stay its injunction pending appeal. The trial court denied the stay on May 18, 1981. On June 25, 1981, a panel of this Court also denied the motion for a stay pending appeal.
 
 INTRODUCTION
 
 25
 The principal issue raised on appeal is whether the district court erred in modifying the 1980 Decree to prevent minority employment from being affected disproportionately by unanticipated layoffs. This issue, however, cannot be properly addressed until it is first determined whether the underlying consent decree is fair and reasonable. Only a reasonable consent decree can be validly modified. Thus, we must first discuss the procedure for approving consent decrees.
 
 PRELIMINARY APPROVAL
 
 26
 Before preliminarily approving a consent decree, a court must first determine that the decree is the result of good faith, arms-length negotiations. United States v. Miami, 614 F.2d 1322, 1330-31 on reh., 664 F.2d 435 (5th Cir. 1981); Flinn v. FMC Corp., 528 F.2d 1169, 1173 (2d Cir. 1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). A preliminarily approved decree is presumptively reasonable. See Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1013 (7th Cir. 1980); United States v. Philadelphia, 499 F.Supp. 1196 (E.D.Pa.1980). Notice of the preliminarily approved decree must be given to class members and others who may be affected by the decree. See Village of Arlington Heights, 616 F.2d at 1014. A hearing should be held after an appropriate period of time. The hearing should be a forum in which any comments and objections to the decree can be aired. Village of Arlington Heights, 616 F.2d at 1014; Equal Employment Opportunity Commission v. American Telephone and Telegraph Co., 556 F.2d 167, 173 (3d Cir. 1977), cert. denied sub nom; Communication Workers of America v. EEOC, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); Dennison v. Los Angeles, 658 F.2d 694, 695-96 (9th Cir. 1981); Baker v. Detroit, 504 F.Supp. 841, 847 (E.D.Mich.1980).
 
 
 27
 In the instant case, the parties engaged in extensive discovery and were fully prepared for trial before they reached a settlement. The City's behavior during discovery was described by the district court as "obstructionist". The City bitterly contested the TRO which enjoined certain promotions in the Fire Department pending the outcome of the Stotts litigation. Four months before the 1980 Decree was announced, the City informed the court that settlement negotiations were continuing. On February 20, 1980, it appeared that settlement negotiations were nearly complete. Five days later, however, the parties appeared before the court and stated that the affirmative relief and monitoring sections of the decree were a source of disagreement. A final agreement on the terms of the 1980 Decree was not reached until nearly two months later on April 25, 1980. The court preliminarily approved the decree and posted it in the fire halls for two weeks.[7] At the end of the two week period, the court held a hearing to consider objections to the decree. Subsequently, the court determined that the decree was a product of arms-length negotiations.[8] The procedure adopted by Judge McRae in preliminarily approving the decree was adequate.
 
 REASONABLENESS HEARING
 
 28
 The determination of whether the decree is adequate, fair, and reasonable should only occur after the court has had an opportunity to hold a hearing to consider objections to the decree. See, e.g., Village of Arlington Heights, 616 F.2d at 1014; Airline Stewards and Stewardesses Assoc. v. American Airlines, 573 F.2d 960, 964 (7th Cir. 1978) (per curiam), cert. denied sub nom., Assoc. of Professional Flight Attendants v. Airline Stewards and Stewardesses Assoc., 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); Culbreath v. Dukakis, 630 F.2d 15, 23 (1st Cir. 1980); Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977); Miami, 614 F.2d at 1331-1334. This reasonableness determination is an issue of law to be determined by the court. See Setser v. Novack Invest. Co., 657 F.2d 962, 969 (8th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); Baker, 504 F.Supp. at 843 n.1. The court should not determine the merits of the controversy or the precise facts underlying the legal positions of the litigants presenting the consent decree. See Swift & Co. v. United States, 276 U.S. 311, 324, 48 S.Ct. 311, 314, 72 L.Ed. 587 (1928); Airline Stewards and Stewardesses Assoc., 573 F.2d at 963-64. Instead, the court should merely satisfy itself that the decree is reasonable.
 
 
 29
 In making the reasonableness determination, the court is under a duty to evaluate three factors. First, the court must consider whether the decree is a fair and adequate resolution of the allegations contained in the complaint.[9] See FMC Corp., 528 F.2d at 1172; United States v. Trucking Employers, Inc., 561 F.2d 313, 317 (D.C.Cir.1977); later app., United States v. Trucking Management, Inc., 662 F.2d 36 (D.C.Cir.1981). Cotton, 559 F.2d at 1330. Ordinarily, the following factors will be considered: 1) the complexity, expense and likely duration of the litigation; 2) the stage of the proceedings and the amount of discovery completed; 3) the risks of litigation; 4) the resources of the defendant; and 5) the reasonableness of the settlement in light of the best possible recovery. See FMC Corp., 528 F.2d at 1173; Ingram v. Madison Square Garden Center, Inc., 21 EPD P 30,393, 13,254 (S.D.N.Y.1979); Women's Committee v. National Broadcasting Co., 76 F.R.D. 173, 175 (S.D.N.Y.1977). The court should be sensitive to the objections made by class members. FMC Corp., 528 F.2d at 1173; Cotton, 559 F.2d at 1331.
 
 
 30
 Second, the court must consider whether the decree is fair and reasonable to non-minorities who may be affected by it. Vulcan Society v. White Plains Fire Department, 505 F.Supp. 955 (S.D.N.Y.1981). Airline Stewards and Stewardesses, 573 F.2d at 964. An identifiable statistical disparity must exist before a decree may embody affirmative relief provisions.[10] See United Steelworkers v. Weber, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979), on remand, Weber v. Kaiser Aluminum & Chemical Corp., 611 F.2d 132 (5th Cir. 1980). The affirmative relief provisions must be reasonably related to the remedial purpose of correcting the racial imbalance in the workforce. See Valentine v. Smith, 654 F.2d 503, 510-511 (8th Cir. 1981); Lehman v. Yellow Freight System, Inc., 651 F.2d 520, 526-527 (7th Cir. 1981); Detroit Police Officers Association v. Young, 608 F.2d 671, 694-698 (6th Cir. 1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); United States v. City of Alexandria, 614 F.2d 1358, 1366 (5th Cir. 1980); Setser, 657 F.2d at 968, 969. See also United Steelworkers v. Weber, supra. The terms of the decree cannot require the discharge of non-minority workers and their replacement with minorities. Id. The decree's provisions cannot bar absolutely the advancement opportunities of non-minorities. Id. Moreover, the decree must be a temporary remedy designed to terminate when it has eliminated the racial imbalance. Id. The decree cannot mandate the hiring or promotion of unqualified individuals. Id. Finally, the court shall retain jurisdiction over the administration of the decree and make such further orders as are necessary.
 
 
 31
 Specific race-conscious hiring and promotion goals and ratios are appropriate elements of consent decrees. The goal of achieving racial diversity in the top ranks of city government is not only reasonable, but a legitimate constitutionally permissible interest a city may pursue. See Talbert v. Richmond, 648 F.2d 925, 931 (4th Cir. 1981); Detroit Police Officers Assoc., supra. This interest justifies individual consideration of race. No decision of the Supreme Court has ever adopted the proposition that the Constitution must be color-blind. See Regents of University of California v. Bakke, 438 U.S. 265, 336, 98 S.Ct. 2733, 2771, 57 L.Ed.2d 750 (1978); Miami, 614 F.2d at 1336. On the contrary, the Supreme Court has approved race-conscious affirmative action in a wide variety of situations where it is an attempt to ameliorate the effects of past discrimination. See United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (reapportionment); McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971) (school desegregation); Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (graduate school admissions policy); Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (admission to union training program); Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (government contracting).
 
 
 32
 The appropriateness of temporary race-conscious employment goals or ratios is a fact sensitive inquiry. The test is whether the technique is a reasonable response to the racial imbalance the decree was designed to erradicate. See Alexandria, 614 F.2d at 1363, 1366. Generally, there should be some relationship between the magnitude of the imbalance, the strength of the goals, and the reasonableness of the provision. Ratios are particularly appropriate where the racial imbalance is highly disproportionate. A "goal which seeks the same racial proportion among employees as in the labor force will ordinarily be reasonable." Detroit Police Officers Assoc., 608 F.2d at 696; Alexandria, 614 F.2d at 1366, n.18.
 
 
 33
 Temporary hiring goals of 50% have been approved routinely as reasonable. See, e.g., Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (reservation of 50% of all openings in apprenticeship craft training program reasonable); Vulcan Society, 505 F.Supp. 955 (50% hiring ratio reasonable where minority representation in population is 16% while workforce representation is only 3%); EEOC v. Bartenders International Union, 22 EPD P 30,700 (N.D.Cal.1979) (50% of job referrals from craft union reasonable); Alexandria, 614 F.2d 1358 (50% hiring goal reasonable); United States v. Jackson, 519 F.2d 1147 (5th Cir. 1975) (50% hiring goal reasonable); Firebird Society of New Haven v. New Haven Board of Fire Commissioners, 66 F.R.D. 457 (D.Conn.1975) (total freeze followed by 50% hiring reasonable where minority representation in workforce is 4% while minorities are 30% of the population); Bolden v. Pennsylvania State Police, 73 F.R.D. 370, aff'd., 578 F.2d 912 (3d Cir. 1978) (50% hiring goal reasonable). In Morrow v. Crisler, 491 F.2d 1053 (5th Cir.), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), the Fifth Circuit reversed an earlier panel decision which had affirmed an affirmative action plan which relied upon the good faith of the defendants where there was gross minority underrepresentation in the employer's workforce. The en banc court ordered the district court to consider temporary 1 to 1 or 1 to 2 hiring, the creation of hiring pools, or a freeze on non-minority hiring.
 
 
 34
 Temporary promotional ratios are also reasonable. See e.g., Baker, 504 F.Supp. 841 (50% promotion ratio reasonable); Dennison, 658 F.2d at 695 (Consent decree which awarded 50% of all promotions to minorities reasonable); Bolden, 73 F.R.D. at 373-74 (33% promotion ratio reasonable); United States v. Philadelphia, 499 F.Supp. 1196, 24 EPD P 31,327 (E.D.Penn.1980) (promotion of 17% of all incumbent female police officers reasonable); Firebird Society, 66 F.R.D. 457 (promotional goal of 33% for the position of lieutenant reasonable); Jackson 519 F.2d 1147 ("accelerated promotions" of incumbent blacks reasonable). In American Telephone and Telegraph Co., 556 F.2d 167, the consent decree directed the Bell System Companies to establish goals and intermediate targets to promote the full utilization of all race, sex and ethnic groups in each of fifteen job classifications. The intermediate targets reflected the representation of such groups in the external labor market in relevant pools for each operating company's workforce. When any operating company was unable to achieve its intermediate target, the decree required it to depart from normal standards and select basically qualified candidates.
 
 
 35
 The final factor a court must consider is all objections to the decree and alternatives to the decree's provisions presented during the hearing. Miami, 614 F.2d at 1334; American Telephone and Telegraph, 556 F.2d at 178. The preliminarily approved decree is presumptively reasonable. Philadelphia, 24 EPD at 18,046, 499 F.Supp. at 1199; Miami, 614 F.2d at 1333. Consequently, one objecting to the decree bears the heavy burden of demonstrating that the decree is unreasonable. Philadelphia, 24 EPD at 18,047, 499 F.Supp. at 1199; Miami, 614 F.2d at 1334. A decree may be finally approved over the objections of class members and non-minorities who are affected by it. See Dennison, 658 F.2d at 696; Holmes v. Continental Can Co., 25 EPD P 31,490 (N.D.Ala.1980). If the decree is rejected, the principled reasons for the rejection must appear on the record. Miami, 614 F.2d at 1333; Philadelphia, 24 EPD at 18,047, 499 F.Supp. at 1199. A decree should be rejected only after the court informs the parties of its precise concerns and gives them an opportunity to reach a reasonable accommodation. Miami, 614 F.2d at 1333.
 
 
 36
 The court should not attempt to impose its perspective on the parties. The court should only determine whether the decree is within the range of reasonableness. Some reliance may be placed on the ability of competent counsel to accurately assess the strengths and weaknesses of each litigant's case. See Cotton, 559 F.2d at 1330; FMC Corp., 528 F.2d at 1173. The decree is a compromise. Neither litigant obtained all that they had hoped to gain initially through litigation.
 
 
 37
 A principal purpose of Title VII is to induce voluntary race-conscious affirmative action. Detroit Police Officers Assoc., 608 F.2d at 690. Courts have placed a high premium on the voluntary settlement of Title VII actions. See, e.g., Alexander v. Gardner-Denver Corp., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); Miami, 614 F.2d at 1331-33. Dennison, 658 F.2d at 696; Village of Arlington Heights, 616 F.2d at 1014-1016. Cotton, 559 F.2d at 1331; United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 846 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); Hutchings v. United States Industries, Inc., 428 F.2d 303, 309 (5th Cir. 1970). Consent decrees enhance the possibility of compliance with Title VII and other employment discrimination laws. Id. Consent decrees may produce more favorable results than more sweeping judicially imposed orders that might risk opposition and resistance. Id. Consent decrees also reduce the cost of litigation, engender judicial economy, and vindicate an important societal interest in affirmative action.[11] Id.
 
 
 38
 On appeal, the standard of review is abuse of discretion. Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979); Cotton, 559 F.2d at 1331, Village of Arlington Heights, 616 F.2d at 1015. Due deference will be given the trial court's greater familiarity with the strategy and the relative strengths of each litigant's case. See Alexandria, 614 F.2d at 1362.
 
 
 39
 In the instant case, all pretrial discovery had been completed. Thus, counsel and the court were in an excellent position to assess the relative strengths of each litigant's case. The parties agreed to the terms of the 1980 Decree. The court found that there was no evidence of collusion, stating "no parroting" had occurred throughout the pretrial period. The 1980 Decree represents a reasonable compromise of their competing interests. The City relinquished no more control over its personnel decisions than was absolutely necessary to avoid a trial on the merits.[12] Plaintiffs did not agree to the decree until it became apparent that they had obtained substantially all they could have obtained, given the risks of litigation.
 
 
 40
 The adequacy of the 1980 Decree can be assessed by considering the statistical evidence of discrimination in the record. This statistical evidence is sufficient to create a strong prima facie case of racial discrimination. In fact, the trial court thought that the evidence was so compelling that it could take judicial notice of the discriminatory employment practices of the City.[13] Minorities were excluded from meaningful participation in the Memphis Fire Department for decades. The goals embodied in the decree are reasonable. However, the goals are merely an adequate response to the gross underutilization of minorities within the Fire Department. The promotion and hiring goals embodied within the 1980 Decree supplement the relief provided in the 1974 Decree. The 1974 Decree contemplated the imposition of these goals if the utilization of minorities was not substantially increased. This contingency in the 1974 Decree is an additional factor enhancing the reasonableness of the 1980 Decree. Significantly, no class member objected to the terms of the 1980 Decree.
 
 
 41
 The court also considered the interests of non-minorities. The affirmative action provisions of the 1980 Decree do diminish the promotional expectations of non-minorities. A simple reduction in the "expectations" does not, however, necessarily make a consent decree unreasonable. For example, in Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, the expectations of non-minorities were adversely affected, yet the affirmative action plan was legal. In the instant case, the harm suffered by incumbent non-minority employees because of the promotional goal is de minimus. Many minorities would have been promoted even absent the consent decree. In fact, absent discrimination, the minority promotion rate should approximate the percentage of minorities in the community.[14] See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 340 n.20, 97 S.Ct. 1843, 1856 n.20, 52 L.Ed.2d 396 (1977); Detroit Police Officers Assoc., 608 F.2d at 696-97. Minorities represent 35% of the Memphis Community, therefore, over the long-run the minority promotion rate should exceed the 20% promotion ratio in the 1980 Decree. Viewed in this light, the promotion ratio in the 1980 Decree is a floor and not a ceiling on minority promotions. The consent decree embodies a minority promotion ratio which is less than the 35% minority promotion ratio which presumptively would be the norm absent the City's past employment practices. Non-minorities allege the 1980 Decree's 20% promotion goal unduly interferes with their expectation of promotion. It appears, however, that the expectation of non-minorities is based upon a pre-decree minority promotion ratio which presumptively would have been significantly higher had the City's employment practices been non-discriminatory. The 1980 Decree eliminated only a portion of the promotional expectations of non-minorities which presumptively were based on the City's discriminatory promotional practices.
 
 
 42
 The court also held a hearing to enable the proposed intervenors to air their objections to the 1980 Decree. The proposed intervenors suggested that the court restructure the Fire Department, institute a constructive promotion procedure, or create more upper management positions so the promotional expectations of non-minorities would not be diminished. The district court rejected these alternatives. The court was correct in summarily rejecting the alternatives suggested by the intervenors. See Philadelphia, 24 EPD at 18,048, 499 F.Supp. at 1199-2000. The court had no authority to restructure the Memphis Fire Department. See National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), on remand sub nom., National League of Cities v. Marshall, 429 F.Supp. 703 (D.C.D.C.1977).
 
 
 43
 Finally, the court determined that the decree was reasonable. We agree. The decree was reasonably related to correcting the underutilization of minorities in the Memphis Fire Department. The decree did not require the discharge of non-minority employees and only encompassed qualified minorities. Moreover, the decree is temporary and does not constitute an absolute bar to the advancement of non-minorities. More importantly, the court has retained jurisdiction to enter such further orders as are necessary to effectuate the purposes of the decree while not unduly trammeling the interests of non-minorities.
 
 OPERATION OF A CONSENT DECREE
 A.
 
 44
 A consent decree is essentially a contractual agreement subject to continued judicial policing. The terms of the decree, unlike those of a simple contract, have unique properties. A consent decree has attributes both of a contract and of a judicial act. See United States v. Motor Vehicles Manufacturers Association of United States, Inc., 643 F.2d 644, 648 (9th Cir. 1981); United States v. ITT Continental Baking Co., 420 U.S. 223, 236, n.10, 95 S.Ct. 926, 934, n.10, 43 L.Ed.2d 148 (1975). Consent decrees are construed for enforcement purposes as contracts. See ITT Continental Baking Co., 420 U.S. at 238, 95 S.Ct. at 935. Brown v. Neeb, 644 F.2d 551 (6th Cir. 1981); Strouse v. J. Kinson Cook, Inc., 634 F.2d 883, 885 (5th Cir. 1981). Aids such as the circumstances surrounding the formation of the decree help determine the purpose for which the decree was entered. See Brown v. Neeb, 644 F.2d at 562; United States v. Bechtel Corp., 648 F.2d 660, 665 (9th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981); ITT Continental Baking Co., 420 U.S. at 238, 95 S.Ct. at 935. The binding substantive commands of a consent decree are embodied within the decree's "four corners". See United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); Strouse, 634 F.2d at 885. A decree embodies the legal constraints which govern the behavior of the parties during the life of the decree. See ITT Continental Baking Co., 420 U.S. at 236, 95 S.Ct. at 934. In interpreting a decree, courts may not depart from its "four corners" unless its language is ambiguous. See Id.; Motor Vehicles Manufacturers Assoc., 643 F.2d at 648.
 
 B.
 
 45
 A decree is always specifically enforceable as written. See ITT Continental Baking Co., 420 U.S. at 238, 95 S.Ct. at 935; Miami, 614 F.2d at 1333; Strouse, 634 F.2d at 885. The subject matter of a decree in an employment discrimination action, the right to litigate the issue of discrimination, is always unique. Both parties relinquish this valuable right in reliance upon the decree. Plaintiff forgoes the right to be made "whole" by proving a violation of Title VII.[15] A defendant, on the other hand, relinquishes the right to rebut the allegations of discrimination and avoid the affirmative responsibilities imposed by a judicial finding of discrimination. A party cannot simultaneously benefit from a decree and ignore its corresponding affirmative obligations. See Strouse, 634 F.2d at 886. The specific performance ordered should ordinarily accomplish that progress which would have occurred but for a party's failure to abide by the terms of the decree. See EEOC v. Local Union No. 38, 25 EPD P 31,553 (N.D.Cal.1981); Bolden, 73 F.R.D. at 370. A trial court has continuing jurisdiction to modify a decree should its operation become unreasonable. See United States v. Chicago, 663 F.2d 1354 (7th Cir. 1981) (en banc); Miami, 614 F.2d at 1333-34.
 
 
 46
 Quite apart from the contractual mandate of specific performance, the court has an independent duty to ensure that the terms of the decree are effectuated. The reasonableness determination is a judicial act and a final order of the court. This determination places the weight and authority of the court behind the terms of the decree. An approved consent decree is not simply a compact between former litigants, rather it is a court order. Consequently, a court has an affirmative duty to protect the integrity of its decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree.[16] For example, in Local Union No. 38, 25 EPD P 31,553, a union was held in contempt for failing to comply with the terms of a consent decree which it had entered. The court increased the number of minorities affected by the decree's affirmative action plan in the amount which the union had failed to meet the plan's goals. In EEOC v. Bartenders International Union, Local No. 41, 22 EPD P 30,700 (N.D.Cal.1979), the court extended the duration of a consent decree and increased the percentage goal of integration where the union fell short of meeting its minority membership goal, the statistical disparity between minority and non-minority in the union workforce continued to exist, and the long-range goal of the decree had not been met. In Bolden, 73 F.R.D. 370, the court modified a consent decree after an unanticipated economic crisis prevented the employer from being able to afford to comply with the terms of a decree which mandated affirmative action. The court increased the minority hiring goal from 33 to 50 percent and the minority promotion ratio from 25 to 33 percent.[17]
 
 C.
 
 47
 The operation of the promotion section of the 1980 Decree does not constitute unconstitutional reverse discrimination. The proposed intervenors suggest that monetary damages, constructive promotions, and front pay are appropriate compensation for non-minority employees who allegedly are adversely affected by the decree's operation. The district court rejected this argument as substantively incorrect. We agree.
 
 
 48
 Compensatory relief is generally intended to make a litigant whole for any losses occasioned by wrongdoing. Thus, the proposed intervenors implicitly contend that the operation of the decree constitutes a compensable wrong. We hold that a reasonable consent decree does not constitute a compensable wrong. In fact, a reasonable consent decree does not adversely affect any legally protected interest of a non-minority. Equal Employment Opportunity Commission v. McCall Corporation, 633 F.2d 1232 (6th Cir. 1980) is instructive on this point. In McCall, male carloaders alleged that a consent decree which granted retroactive seniority to female employees constituted an act of discrimination. Judge Kennedy, speaking for this Court, held:
 
 
 49
 "Acceptance of plaintiffs' theory that a conciliation agreement and consent decree resulting from a Title VII action can itself be an act of discrimination would create major problems.
 
 
 50
 This court is convinced that the consideration of a conciliation agreement which results in a consent decree as an act of discrimination against employees not benefitted by that agreement would create a situation in which each settlement would spark new rounds of litigation, settlement of claims would be discouraged, and the courts would continually be faced with stale claims. Consequently, we hold that conciliation agreement resulting in consent decrees may not be considered independent acts of discrimination, as a matter of law, unless there are allegations of bad faith in making the agreement, that is allegations that the agreement was not a bona fide attempt to conciliate a claim but rather an attempt to bestow unequal employment benefits under the guise of remedying discrimination." Id. at 1238; Freeze v. Aro, Inc., 503 F.Supp. 1045, 1047 (E.D.Tenn.1980). Accord, Setser v. Novack Investment Co., 657 F.2d 962, 970 (8th Cir. 1981) (en banc).
 
 
 51
 A consent decree may be attacked only on the ground that its substantive provisions unlawfully infringe the rights of the complainant. See Society Hill Civic Assoc. v. Harris, 632 F.2d 1045, 1059 (3d Cir. 1980). We hold that a reasonable consent decree which embodies an affirmative action plan does not affect any legally protected interest of non-minorities. See McCall, 633 F.2d at 1238. Therefore, reverse discrimination challenges to reasonable consent decrees are impermissible collateral attacks. See Dennison, 658 F.2d at 695. Prate v. Freedman, 430 F.Supp. 1373 (W.D.N.Y.), aff'd., 573 F.2d 1294 (2d Cir. 1977), cert. denied, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978); O'Burn v. Shapp, 70 F.R.D. 549 (E.D.Pa.), aff'd., 546 F.2d 418 (3d Cir. 1976), cert. denied, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977). See also, Miami, 614 F.2d at 1329 (Consent decree cannot be challenged by a party whose rights are not affected by it).
 
 
 52
 The proposed intervenors have not alleged that the 1980 Decree was the product of collusion. Indeed, this record would not support such an allegation. Moreover, the 1980 Decree is reasonable. Thus, the proposed intervenors' action is an impermissible collateral attack. See Dennison, 658 F.2d at 695-96.
 
 
 53
 Moreover, awarding compensatory relief to non-minority employees would impose conflicting or inconsistent obligations on the City. This is particularly true of the constructive promotion suggestion. Under this alternative, each time the City attempted to promote minorities, it would be required to provide an equivalent amount of compensation to a non-minority employee who allegedly would have been promoted but for the decree. This extra compensation would drastically increase the cost of each promotion and the cost of complying with the 1980 Decree. This increased cost would destroy a primary incentive which motivated the City to enter the 1980 Decree. Thus, permitting the proposed intervenors to sue for compensation would be inimical to the policy of encouraging the settlement of Title VII actions.
 
 
 54
 In addition, the compensatory relief sought by the proposed intervenors frustrates the purpose of the decree. The purpose of the decree is to correct the effects of those past employment practices of the City which may have been racially discriminatory. The decree provides that minorities are entitled to certain affirmative treatment and consideration in future promotions because of the City's past employment practices. Evidence contained in this record not only supports this entitlement, but is sufficient to establish a prima facie case of racial discrimination. The decree is designed to correct past employment practices which illegally benefited non-minorities. The proposed intervenors seek to confer indirectly the benefits of the decree on non-minorities. Therefore, the relief sought by the proposed intervenors is patently inconsistent with the purpose of the decree.
 
 
 55
 Finally, if the consent decree could constitute an actionable wrong, the City would be subject to dual obligations. The failure to enter a consent decree would leave the City potentially liable in the Plaintiffs' employment discrimination action. On the other hand, the proposed intervenors imply that compliance with the decree would subject the City to "reverse discrimination" suits seeking comparable relief for non-minorities. The proposed intervenors' position places the City in a "Catch-22" position of incurring liability for employment discrimination without regard to the action taken. The absurdity of placing employers in this position has been noted by several courts. See Telephone Workers Union of New Jersey Local 827 v. New Jersey Bell Telephone, 450 F.Supp. 284, 298 (D.N.J.1977), aff'd., 584 F.2d 31 (1978); Dennison, 658 F.2d at 695-6; Hunter v. St. Louis-San Francisco Ry. Co., 639 F.2d 424, 425 n.2 (8th Cir. 1981). See also Alexandria, 614 F.2d at 1366.
 
 
 56
 The proposed intervenors contend that this potential double liability is necessary to ensure that an employer bears the full price of its past wrongdoing. Permitting double liability in this situation would clearly maintain the status quo. At a minimum, double liability would so escalate the cost of affirmative action that an employer's ability to implement an affirmative action plan would be severely crippled. As a result, affirmative action would be impractically expensive.
 
 
 57
 It is unfortunate that the City engaged in the employment practices which precipitated the decree. However, non-minorities benefitted from, practiced, and acquiesced in those practices. The 1980 Decree is a reasonable means to correct the adverse effects which minorities shouldered as a result of those employment practices. The decree does not adversely affect any legally protected interest of non-minorities.
 
 
 58
 The proposed intervenors apparently agree that some action must be taken to ensure that discrimination does not prevent minorities from receiving a fair share of the economic opportunities available. They disagree, however, on the means selected to accomplish this end. The proposed intervenors assert that non-minorities are unhappy with the promotion section of the 1980 Decree. This temporary measure only partially realigns promotional expectations to reflect minority employment levels which would have occurred absent the discrimination. This realignment vindicates a societal interest in remedying the effects of racial and more than justifies the displeasure some non-minorities may experience. Moreover, the proposed intervenors disregard the fact that minorities may also be dissatisfied with the temporary relief afforded by the 1980 Decree. In fact, minorities may be less than totally satisfied that the remedial provisions of the decrees are adequate compensation for the many opportunities foreclosed to them for decades. The dissatisfaction which non-minorities and minorities may experience is inherent in the compromise which the 1980 Decree represents. A consent decree reached after negotiation and consultation is the preferred means of balancing the conflicting societal and individual interests inherent in any employment discrimination action. The only alternative to a consent decree is a costly and lengthy trial which would only confront the court with the difficult question of how much affirmative action must be imposed to correct the effects of past employment discrimination.
 
 III. THE PRELIMINARY INJUNCTION
 
 59
 On May 4, 1981, the City announced that an unanticipated economic crisis required the layoff of certain personnel in nonessential services. The proposed layoffs were unprecedented in the City's history. The affirmative relief accomplished under the decrees would be severely eroded by the proposed layoff policy. Subsequently, the court granted an injunction preventing the City from applying the layoff policy in a manner which would reduce the percentage of minority employees in each job classification below that which existed before the layoffs were announced. The City and the Union brought this appeal. We must weigh whether the plaintiffs have shown a strong possibility of success on the merits, whether the plaintiff or defendant would suffer irreparable harm and whether the public interest warrants the injunction. See, e.g., Mason County Medical Assoc. v. Knebel, 563 F.2d 256, 261 (6th Cir. 1977). The standard of appellate review is whether the district court abused its discretion in granting the preliminary injunction. United States v. School District of Ferndale, 577 F.2d 1339, 1360 (6th Cir. 1978), on remand, 460 F.Supp. 352, vacated, 616 F.2d 895 (6th Cir. 1980), on remand, 499 F.Supp. 367 (E.D.Mich.1980).
 
 
 60
 Judge McRae did not abuse his discretion in granting the preliminary injunction. First, the statistics denoting the racial composition, hiring and promotion practices of the Fire Department adequately indicate the probability of plaintiff's success on the merits.[18] Moreover, the entry of the 1980 Decree constituted a "determination of probability of success on the merits." Culbreath v. Dukakis, 630 F.2d 15, 23 (1st Cir. 1980). Second, the proposed layoffs would irreparably harm minorities by preventing them from acquiring the experience necessary for supervisory positions. Finally, the injunction serves the public interest by not allowing unexpected events to eradicate the progress made pursuant to an affirmative action plan. Brown, supra. Racial diversity in the supervisory ranks of municipal government serving an urban multi-racial city is, as Judge Lively noted in Detroit Police Officers Assoc., desirable and in the public interest. See Talbert v. Richmond, 648 F.2d 925, 931 (4th Cir. 1981).
 
 IV. MODIFICATION OF A CONSENT DECREE
 
 61
 There are three grounds upon which a consent decree may later be modified. First, a decree may be modified in accordance with basic contract principles. Brown, 644 F.2d at 559-560. Moreover, Rule 60(b) provides relief from a consent decree upon a showing that the decree is void or is no longer equitable. Fed.R.Civ.P. 60(b)(4), (5). See EEOC v. Safeway Stores, Inc., 611 F.2d 795, 799 (10th Cir. 1979), cert. denied sub nom., Courtwright v. EEOC, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980); Brown, 644 F.2d at 560 n.17; Philadelphia Welfare Rights Org'n. v. Shapp, 602 F.2d 1114, 1120-21 (3d Cir. 1979), cert. denied sub nom. Thornburgh v. Philadelphia Welfare Rights Org'n., 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). A trial court's ruling on a Rule 60(b) motion will not be disturbed absent an abuse of discretion. See Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979); Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). Finally, a court of equity has continuing jurisdiction to modify a decree upon changed circumstances. United States v. Swift & Co., 286 U.S. 106, 114-15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); Brown, supra. Modification of a consent decree, of course, requires a full hearing and findings of fact. United States v. Atlantic Refining Co., 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959); Hughes v. United States, 342 U.S. 353, 357-58, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952); Brown, 644 F.2d at 560.
 
 A.
 
 62
 The 1980 Decree imposes a duty on the City to engage in certain affirmative action in its hiring and promotion decisions. The decree does not contain a provision which would prevent the operation of the decree if one party experiences an economic hardship. In April of 1981, the City experienced an unanticipated economic crisis. The City unilaterally determined that a reduction in the number of City workers could lessen the severity of the crisis. Alternative methods for meeting the crisis were available. The City had ultimate responsibility for determining: 1) that city-wide layoffs were the alternative which would most effectively relieve the crisis; and 2) which job classifications would be subject to the layoff policy. It is uncontroverted that the application of the layoff policy to the job classifications selected by the City would have virtually destroyed the progress belatedly achieved through affirmative action. The City contracted in the 1974 and 1980 Decrees to accomplish precisely that which the layoffs would destroy: a substantial increase in the number of minorities in supervisory positions.
 
 
 63
 The district court, sitting as a court of equity, had the equitable power to order specific performance of the terms of the 1974 and 1980 decrees. As noted, the 1980 Decree is based upon the mutual assent of the parties and a judicial determination of reasonableness. This Decree mandates an increase in the level of minority employment and promotion within the First Department. Minorities hired and/or promoted pursuant to the 1980 Decree were parties to and the intended beneficiaries of the 1980 Decree. Therefore, the City's announcement to these employees was in effect notice of the City's intended anticipatory repudiation of the 1974 and 1980 Decrees. The announcement notified Plaintiffs that 1) relief previously granted pursuant to the Decrees would be diminished; and 2) prospective relief under the Decrees would not be forthcoming.
 
 
 64
 In response to the City's announcement, the Plaintiffs sought to enjoin the proposed layoffs. However, it is apparent from Judge McRae's treatment of this case that he properly recognized that Plaintiffs did not seek to modify contractually the existing consent decrees. Instead, Plaintiffs merely sought to compel compliance with the terms and goals of the Decrees. Under the terms of the Decrees, the City was obligated to employ reasonable, good faith efforts to fulfill the goal of increasing minority representation in each job classification in the fire department to levels approximating the minority population represented in the civilian labor force in Shelby County.
 
 
 65
 The City's failure to fulfill its obligations under the Decrees would have subjected it to liability for violating both its contractual obligations and a judicial order. The City contends that the sole reason for the layoff proposal was economic hardship. This argument is meritless. It is hornbook contract law that economic hardship does not excuse performance under a contract. See J. Calamari and J. Perillo, Contracts, 491 (2d ed.). Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co., 508 F.2d 283 (7th Cir. 1974). Consequently, the decrees remained specifically enforceable. See ITT Continental Baking Co., 420 U.S. at 236, 95 S.Ct. at 934. Plaintiffs were presumptively entitled to full performance of the terms of the Decrees. Therefore, the court's modification of the decree is simply an exercise of its equity jurisdiction to temporarily relieve the hardship on the City which strict compliance with the decrees would have caused. The modification allows the City to proceed with its layoff policy subject to reasonable deference to its obligations under the decrees. In our view, the court's decision to modify the Decrees is a reasonable accommodation of competing interests and obligations. The modification partially alleviates the City's misfortune, while protecting the integrity of the court's initial orders. The court gave due deference to the City in structuring its internal affairs. See National League of Cities v. Usery, supra. Comity and an appreciation of federalism caused the court to exercise its equitable powers to apportion the burden of meeting the City's fiscal crisis on minorities and non-minorities alike. The court retains authority to mandate full compliance with the decrees should circumstances change.
 
 B.
 
 66
 The relief granted under Fed.R.Civ.P. 60(b) is extraordinary and may be granted only upon a showing of exceptional circumstances. Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977); Philadelphia Welfare Rights Org'n., 602 F.2d at 1119; Brown, 644 F.2d at 560, n.17. A change in the facts upon which the consent decree is based usually constitutes an exceptional circumstance. See King-Seeley Thermos Co. v. Aladdin Industries, Inc., 418 F.2d 31, 35 (2d Cir. 1969), on remand, 320 F.Supp. 1156 (D.Conn.1970). See also Safeway Stores, 611 F.2d at 800. A consent decree may also be modified "where a better appreciation of the facts in the light of experience indicates that the decree is not properly adapted to accomplishing its purposes." Chance v. Board of Examiners, 561 F.2d 1079, 1086 (2d Cir. 1977), quoting King-Seeley Thermos Co., 418 F.2d at 35. The availability of relief under Rule 60(b) is not squarely presented on this appeal.[19] We, therefore, express no opinion on whether the 1980 Decree could have been modified pursuant to Rule 60.
 
 C.
 
 67
 A trial court has broad discretion in administering consent decrees. See, e.g., Brown, supra; Safeway Stores, 611 F.2d at 799; American Telephone and Telegraph Co., 556 F.2d at 178. While acting within its equity jurisdiction, a trial court has continuing jurisdiction to modify a consent decree upon a showing that "changed circumstances" have transformed the original decree into an instrument of wrong. See, e.g., United States v. Swift & Co., 286 U.S. 106, 114-115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); Hughes v. United States, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952); Brown, supra. The court's power to modify the terms of a decree should not be exercised lightly. Swift & Co., supra. Modification is proper where it has been demonstrated in an evidentiary hearing that new and unforeseen conditions have created a hardship. See Brown, 644 F.2d at 559. Accord Chrysler Corp. v. United States, 316 U.S. 556, 562, 62 S.Ct. 1146, 1149, 86 L.Ed. 1668 (1942) (The test is "whether the change served to effectuate or thwart the basic purpose of the original consent decree."). See United States v. Chicago, 663 F.2d 1354, 1360 (7th Cir. 1981) (en banc) (the standard for modification is not "based solely on hardship." It incorporates consideration of whether the purpose of the decree has been achieved). See also Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d 914, 916 (6th Cir. 1979). See generally Requests By The Government For Modification of Consent Decrees, 75 Yale L.Rev. 657 (1966); Flexibility and Finality in Antitrust Consent Decrees, 80 Harv.L.Rev. 1303 (1967). New and unforeseen conditions exist where there has been a fundamental change in the essential facts upon which the decree is based. See Safeway Stores, 611 F.2d at 800 (new, unforeseeable circumstances not present where "there is no evidence indicating that the facts-e.g., the nature and makeup of Safeway employees and operations-against which the decree and the interpreting order were framed have substantially changed.").
 
 
 68
 It is well settled that a court can modify a consent decree where layoffs caused by an unanticipated economic crisis threatens to frustrate the purpose of the decree. See Brown, 644 F.2d 551; Bolden, 73 F.R.D. at 371-72; Castro v. Beecher, 522 F.Supp. 873 (D.Mass.1981). Thus, even if Judge McRae's decision is not construed as compelling compliance with the terms of the Decrees, there exists an independent justification for the modification.
 
 
 69
 In Brown, this court held that a trial court could exercise its inherent authority to modify a consent decree where an economic crisis unexpectedly caused the City of Toledo to lay off firemen. The layoffs were a new and unforeseen changed circumstance which threatened to frustrate the purpose of the Brown decree by destroying its mandated affirmative action. The nature and racial composition of the Toledo Fire Department would also have been radically altered by the layoffs.
 
 
 70
 The factual situation which Judge McRae faced was virtually identical to that which confronted Judge Young in Brown. Judge McRae specifically found that: 1) the proposed layoffs were an unexpected circumstance not anticipated by the parties when they entered the decree; 2) the purpose of the 1980 Decree was to correct the past hiring and promotion practices of the City through affirmative action; and 3) the proposed layoffs would have a devastating and retrogressive effect on the affirmative action mandated in the 1974 and 1980 Decrees. These findings have not been challenged on appeal. The findings are not clearly erroneous.
 
 
 71
 The proposed layoffs would impose an undue hardship on Plaintiffs. The Plaintiffs have relied on the affirmative action provisions of the 1980 Decree. Thus, they have foregone their right to litigate the City's past employment practices and possibly obtain greater relief. The proposed layoffs would wrench the belated relief provided by the 1980 Decree from the Plaintiffs. The City unilaterally selected the job classifications in the Fire Department which would be affected by the proposed layoffs. The job classifications selected were those where minorities had recently made the most gains under the affirmative action provisions of the 1974 and 1980 Decrees. Judge McRae was correct in not allowing the City to eradicate the belated affirmative action it had contracted to accomplish in the 1974 and 1980 Decrees. Judge McRae did not issue a blanket order enjoining the layoff of all minority workers. Instead, the court merely prevented the City from reducing the percentage of minorities in each job classification. Judge McRae did not abuse his discretion in modifying the consent decree and enjoining the City from reducing the percentage of blacks in certain job categories within the City Fire Department.
 
 V. THE SENIORITY SYSTEM
 
 72
 The city and the Union both assert that the trial court abused its discretion in modifying the 1980 Decree. Allegedly, the modification impermissibly awarded "constructive seniority" to minorities in violation of Franks v. Bowman Transp. Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) and International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), on remand sub nom., EEOC v. T. I. M. E.-D. C. Freight, Inc., 659 F.2d 690 (5th Cir. 1981). In Franks, the Supreme Court held that retroactive seniority may be granted to individuals by a court only upon a showing of post-Act discrimination against the particular individual. Teamsters held that § 703(h) of Title VII, 42 U.S.C. § 2000e-2(h), immunizes "bona fide" seniority systems which perpetuate the effects of discrimination which occurred prior to the effective date of the act. Assuming without deciding the Firefighters Union is recognized as such under Tennessee law,[20] the City's and the Union's reliance on Teamster's and Franks is misplaced.
 
 
 73
 A court does not abuse its discretion in modifying or approving a consent decree which conflicts with the provisions of a collective bargaining agreement.[21] At least three theories have been advanced which indicate that a consent decree can alter existing seniority provisions over the objection of an adversely affected union. Each of the theories and the circuit courts which espouse them are described below.
 
 A.
 
 74
 The settlement theory allows a consent decree to alter existing seniority provisions. The settlement theory is epitomized by Airline Stewards and Stewardesses Association, supra. There the plaintiffs, a class of former female flight attendants, alleged that the defendant violated Title VII. After the plaintiffs were granted summary judgment, the parties reached a settlement during the appellate briefing process. That settlement provided inter alia that the plaintiffs would receive full retroactive "occupational seniority" upon reinstatement. The exclusive bargaining agent for American Airlines attendants intervened and objected to this provision of the settlement. The trial court, however, approved the settlement.
 
 
 75
 On appeal, the Seventh Circuit rejected the argument that Teamsters required each plaintiff to prove that she would have continued in her employment but for the defendant's wrongful termination. The court held that:
 
 
 76
 "We believe that the issues raised by the intervenor should not be decided on the basis of Title VII law, but rather must be decided on the basis of legal principles regulating judicial review of settlement of agreements.
 
 
 77
 It is a well-settled principle that the law generally favors the encouragement of settlements. (citation omitted) That general rule has been recognized as applicable to settlements in Title VII cases. Patterson v. Newspaper & Mail Deliverers Union of N. Y. & Vicinity, 514 F.2d 767, 771 (2d Cir. 1975). In fact, one court has concluded that it is "the clearly expressed intent of that Act to encourage settlements." Flinn v. FMC Corp., 528 F.2d 1169, 1174 (4th Cir. 1975). In addition, it is generally recognized that settlements are entered into because of "the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense ..." Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960). Based on these considerations, this court has held that a district court in reviewing a settlement agreement "should not attempt to decide the merits of the controversy ... (because) (a)ny virtue which may reside in a compromise is based upon doing away with the effect of such a decision." Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976).
 
 
 78
 Applying these general principles to this case, we believe the district court correctly declined to decide the merits of each of the plaintiffs' claims. Intervenors essentially ask this court to require in excess of 100 mini-trials on issues dealing with the adequacy of each plaintiff's complaint and the availability of defenses. It seems to us beyond serious dispute that no reasonable parties are going to settle any case if an intervenor can force them to litigate separately the merits of each claim. The rule urged by the intervenor would most seriously discourage efforts to settle Title VII cases, and we refuse to sanction such a result. Id. at 963-64.
 
 
 79
 In Safeway Stores, the question presented was whether to modify a consent decree. Although the Tenth Circuit held the decree could not be modified, the court did endorse the rationale underlying the Seventh Circuit's decision in Airline Stewards and Stewardesses, supra. In dicta the court stated:
 
 
 80
 "Teamsters prohibits abrogation of a seniority system only if that system is bona fide. Because this case was never litigated, there has been no determination that Safeway's seniority system is bona fide. Intervenors would have us assume at this point that the system was bona fide, or at the least, remand the case for a hearing and determination. This we decline to do. The policy of voluntary settlement so important to the enforcement of Title VII would be seriously undermined if the approving court were required to establish the facts underlying the parties' positions before approving a consent decree. The power to compromise exists partially because of the uncertainties and expense typical of adversary hearing and judicial determinations of fact. West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085-86 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). We concur with the district court, "A Consent Decree would be worthless if it could be attacked on the ground that had the Court made a particular determination, such relief would then not be statutorily available." Id. at 801.
 
 
 81
 We adopt the position of the Seventh Circuit in Airline Stewards and Stewardesses and the Tenth Circuit in Safeway Stores. A strong policy favoring voluntary settlements is embodied within Title VII. E.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974), on remand, 8 FEP 1153, aff'd., 519 F.2d 503 (10th Cir. 1975), cert. denied, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). Airline Stewards and Stewardesses, 573 F.2d at 963; United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826 (5th Cir. 1976), cert. denied sub nom National Organization for Women, Inc. v. United States, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). This policy would be seriously undermined if the facts underlying each parties' positions were required to be established. Accordingly, the trial court's determination that the seniority provisions were non-bona fide is vacated. The modification of the consent decree was not error, even though the Union's seniority system may have been affected.
 
 B.
 
 82
 My opinion in Brown endorsed a second basis for holding that a consent decree can modify an existing seniority system. The theory's premise is that a consent decree, the preferred means of resolving an employment discrimination suit, does not decrease the power of a court to order relief which implicates the policies of Title VII and 42 U.S.C. §§ 1981 and 1983. This theory has been approved by the Third Circuit in an earlier decision, EEOC v. American Telephone and Telegraph Co., 419 F.Supp. 1022 at 1038-1040, aff'd., 556 F.2d 167 (3d Cir. 1977). In American Telephone and Telegraph, Judge Higginbotham reasoned as follows. First, he noted that had plaintiff's allegation been established, the court would clearly have had the power to modify the existing seniority system to require affirmative action in promotions and transfers. He also noted that Congress had selected cooperation and voluntary compliance as the "preferred means" of achieving the equal employment opportunity policies of Title VII. Alexander, supra, 415 U.S. at 44, 94 S.Ct. at 1017. Finally, he concluded:
 
 
 83
 Since ... (the consent decree) is the product of cooperation and voluntary (though possibly grudging) compliance, it is a particularly striking example of the successful use of the means preferred by Congress for the achievement of Title VII's goals. In my judgment, then, it would frustrate the purposes of Title VII to treat the absence of evidence about AT&T's discrimination in transfer and promotion policies, and AT&T's denial of liability for such discrimination, as insuperable obstacles to the ordering of affirmative action in transfers and promotions. I decline to do so. For the remainder of this opinion, therefore, I shall treat the allegations of the complaint with respect to transfer and promotion as if they had in fact been proved at trial. To approach them in any other way would make a mockery of the "preferred means" chosen by Congress to effectuate the goals of Title VII.
 
 
 84
 My reasoning in Brown parallels that of Judge Higginbotham in American Telephone and Telegraph, supra. In Brown, the Supremacy Clause enabled the trial court to override the conflicting provisions of a seniority system and Ohio law because the case had been brought pursuant to 42 U.S.C. §§ 1981 and 1983, as well as Title VII. In the instant case, the Stotts complaint alleged violations of 42 U.S.C. §§ 1981 and 1983 in addition to Title VII. If a violation of 42 U.S.C. § 1983 had been established, the court would have had the authority to invoke the Supremacy Clause to override the Union's seniority provisions and state law. See, e.g., Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); Brown, supra. It would be incongruous to hold that the use of the preferred means of resolving an employment discrimination action decreases the power of a court to order relief which vindicates the policies embodied within Title VII and 42 U.S.C. §§ 1981 and 1983. We, therefore, refuse to do so. The trial court had authority to override the Firefighter's Union seniority provisions to effectuate the purpose of the 1980 Decree.
 
 C.
 
 85
 The third basis for approving a consent decree which conflicts with the provisions of a collective bargaining agreement is represented in Sisco v. J. S. Alberici Construction Co., Inc., 655 F.2d 146 (8th Cir. 1981). In Sisco, the Eighth Circuit held that an employer can temporarily override the provisions of a collective bargaining agreement pursuant to a valid affirmative action plan. The employer, Alberici, unilaterally adopted an affirmative action plan to comply with the federal contract regulations. The plan established a 10 percent goal for the number of minority hours of employment on each of the Alberici's projects.
 
 
 86
 Clyde Sisco, a white male, was employed as an ironworker on the Post Office project. He also held the position of union steward. During the course of work on the project, Alberici determined that it did not need four ironworkers. However, to maintain compliance with the goals set in federal regulations, a cutback in its force required the maintenance of at least one minority ironworker on the site. Consequently, Sisco and another white ironworker were laid off, while the only black ironworker and the crew foreman, a white male, were retained. Sisco protested this action and informed Alberici that under the Ironworkers Collective Bargaining Agreement, Sisco, as union steward, was entitled to special treatment. Under the Agreement, the steward is supposed to be "the last man laid off." Subsequently, he brought suit, alleging his removal from the Post Office Project violated Title VII and 42 U.S.C. § 1981.
 
 The court held:
 
 87
 "It (Alberici) was under pressure from government officials to improve its percentage of minority hours worked. There was a history of exclusion of black workers from the ironworkers' trade in St. Louis. Alberici had decided, for reasons wholly unrelated to race or to Sisco personally, to reduce its force of ironworkers at the Post Office from four to two. In order to accomplish that goal without further worsening its ratio of minority hours, the black ironworker (who had been on the site longer than Sisco and whose qualifications are not questioned) had to be retained. Of the two employees left, one was white. The St. Louis Plan (the affirmative action plan) was temporary, in the sense that its goals were expressed in terms of percentages of hours worked; once the percentages were met, no further action by the company was required. Sisco was not replaced by a new black worker. A qualified black employee with more seniority on the job site was simply retained in preference to Sisco and another white man. For these reasons, we hold that Alberici's initial decision to remove Sisco from the Post Office job was not unlawful." Id. at 149. See Savannah Printing Specialties & Paper Products Local 604 v. Union Camp Corp., 350 F.Supp. 632 (S.D.Ga.1972).
 
 
 88
 The Eighth Circuit's analysis in Sisco indicates that the City would have, at Plaintiff's urging, modified the provisions of the collective bargaining agreement to accomplish the goals set out in the 1980 Decree without violating Title VII or 42 U.S.C. § 1981. The City specifically empowered the trial court to enter "such further order as may be necessary or appropriate to effectuate the purpose of this decree." Consequently, the trial court could use this derivative authority to temporarily override the provisions of the Union's collective bargaining agreement.
 
 VI. CONCLUSION
 
 89
 Judge McRae has at all times during this very difficult and complex case displayed sound reasoning, restraint and wisdom in his actions. The balance he struck between the interests of the City, the Union, incumbent non-minority employees, and minorities who have relied upon the consent decree is appropriate and consistent with the law. Judge McRae did not abuse his discretion in approving the 1980 Decree or in modifying the decree to enjoin the City from destroying the belated affirmative action accomplished under the decrees. Accordingly, the judgment of the district court is affirmed.
 
 
 90
 BOYCE F. MARTIN, Jr., Circuit Judge, concurring in part, dissenting in part.
 
 
 91
 I write separately because I can concur only in the result. I agree that the District Court properly enjoined the City of Memphis from laying off black firefighters on the basis of city-wide seniority. In my view, the plaintiffs satisfied the traditional prerequisites for injunctive relief, and the District Judge did not abuse his discretion in granting plaintiffs the temporary relief which they sought. I also agree that the District Court erroneously determined that the seniority system was not bona fide.
 
 
 92
 However, I can agree with only one of the theories Judge Keith espouses to justify modification of the consent decree by injunction. Judge Keith is correct in stating that a consent decree is essentially a contract between adversaries to end litigation and settle differences. As such, a decree is subject to interpretation and construction as a contract. Unfortunately, the parties did not foresee the financial crisis which required massive layoffs. The decree therefore contains no provision that could be construed either to prohibit or permit layoffs according to city-wide seniority.
 
 
 93
 However, the decree contains the following provision whereby the parties agreed that the District Court should retain jurisdiction over the parties: "for such further orders as may be necessary or appropriate to effectuate the purposes of this decree." In essence, this provision is boiler-plate language which recognizes that the District Court has the power to modify the consent decree in light of changed circumstances, in order to preserve the level of benefits procured through the decree. I disagree with Judge Keith to the extent he concludes that this clause gives the District Court "derivative authority" to modify the provisions of the Union's collective bargaining agreement. However, to the limited extent that Judge Keith concludes that the District Court did not abuse its discretion in protecting the status quo in the Fire Department by injunction, I concur.
 
 
 94
 The District Court's decision to enjoin imminent layoffs was made after an evidentiary hearing and was based on its assessment that the decree would be vitiated by the impending layoffs. I believe that a District Court should be cautious in modifying a consent decree, especially if such action would cause the parties to assume obligations for which they have not contracted. Judge Brown, speaking for himself and Wiseman, the majority of the panel, articulated this concern in his special concurrence in Brown v. Neeb, 644 F.2d 551, 565 (6th Cir. 1981):
 
 
 95
 Because the City is being required to pursue a course of action that it has not, by the consent decree, contracted to follow, and because liability has never been established, it seems to me that the district court should take particular care to exercise judicial restraint in modifying the consent decree to overrule the decision of the elected City officials and their appointees concerning the proper way to meet this financial crisis.
 
 
 96
 These considerations apply with equal force to the circumstances of the present case; and based upon the facts found by the District Court, I cannot say that its decision to enjoin impending layoffs was an abuse of discretion.
 
 
 97
 I disagree with Judge Keith's statement that: "a consent decree can alter existing seniority provisions over the objection of an adversely affected union." As support for this statement, Judge Keith reasons that this Court held in Brown that "the Supremacy Clause enabled the trial court to override the conflicting provisions of a seniority system and Ohio law because that case had been brought pursuant to 42 U.S.C. §§ 1981 and 1983 as well as Title VII." I cannot agree that his statement accurately reflects this Court's holding in Brown. Although Judge Keith reached this conclusion in his opinion in that case, Judge Brown expressly rejected it in his special concurrence, in which District Judge Wiseman joined. As I read Brown, its holding on the issue of a union's rights is expressed in Judge Brown's opinion. Judge Brown, writing for himself and for District Judge Wiseman, the majority of the panel, stated that:
 
 
 98
 In my view, even though this action was brought pursuant to 42 U.S.C. §§ 1981 and 1983 and not pursuant to Title VII, the district court did not have the authority, when it issued the preliminary injunction to abrogate the contract and statutory rights of the Union to layoffs by seniority. The Union, although it had existing contract and statutory rights to layoffs by seniority, was not a party to this litigation when it was filed and when the consent decree was entered. Therefore, its rights vis-a-vis the City were not affected by the consent decree. Although it intervened at the time plaintiffs moved for the instant preliminary injunction, there was, again, no determination of liability in this proceeding, and the Union's position was that the district court could not and should not authorize layoffs on a basis other than seniority. The district court did not so authorize layoffs. The district court could abrogate the rights of the Union to layoffs by seniority, as required by its contract and the Ohio statute, only in a proceeding in which the Union was a party, and in which there was a determination that: (1) plaintiffs' constitutional rights had been infringed; and (2) it was necessary to vindicate plaintiffs' constitutional rights to hold such contract and statutory rights of the Union to be unenforceable.
 
 
 99
 644 F.2d at 566.
 
 
 100
 Applying Judge Brown's reasoning here, I must conclude that the District Court has no authority to abrogate the Union's contractual and statutory rights. The Union was not a party to this suit when the consent decree was entered. Judge McRae simply enjoined the City from making its proposed layoffs in the Fire Department. Judge McRae's actions do not affect the collectively bargained rights of the Union. I therefore dissent from Judge Keith's opinion, to the extent that it holds otherwise. The law in this Circuit does not sanction modification of a consent decree to alter or destroy the rights of a non-party union concerning layoffs by seniority, unless a hearing is held in which the union is a participating party, and a court determines that: "(1) plaintiffs' constitutional rights had been infringed; and (2) it was necessary, to vindicate plaintiffs' constitutional rights, to hold such contract and statutory rights of the Union to be unenforceable." Brown v. Neeb, 644 F.2d at 567 (Brown, J. concurring in result only). (emphasis added).
 
 
 101
 Furthermore, the consent decree does not concede liability, and it cannot be construed as such an admission. The District Court has never held an evidentiary hearing nor has it determined that the City is liable for past acts of discrimination. To the extent that Judge McRae and Judge Keith assume that liability has, in fact, been established, I must also disagree.
 
 
 102
 I dissent from those sections of Judge Keith's opinion that purport to discuss the merits of the proposed intervenors' suggestions for alternative relief. As I read the record, Judge McRae never held a hearing on the merits of constructive promotion, monetary damages, or any of the other alternatives advanced by the unsuccessful intervenors in their motion to intervene. In fact, Judge McRae did not discharge his duty to consider fully the interests of incumbent employees before approving the settlement decree. See Airline Stewards v. American Airlines, 573 F.2d 960 (7th Cir. 1978). The sole purpose of the May 16, 1980 hearing was to determine the validity and timeliness of the intervention request itself. The only consideration Judge McRae gave to the merits of the proposals he expressed in these words: "And I would not be a party to any of this constructive promotion bit. That's not much good for anybody. And it is certainly not good-well, that's no way to run a fire department."
 
 
 103
 Today this Court has upheld the District Court's decision that the intervention motion was untimely. Stotts v. Memphis Fire Department, 679 F.2d 579. I have dissented from that conclusion, and I reaffirm my judgment on the intervention issue here. Judge Keith states for the majority that the proposed intervenors' attempt to intervene to challenge the consent decree is "an impermissible collateral attack." Judge Keith misapprehends the very purpose of intervention, which is to afford to unrepresented persons who have an interest in litigation a legitimate avenue for asserting and protecting that interest. Intervention confers standing on a party to participate in litigation and thus affords the intervening party the very means by which to avoid estoppel. I also disagree with Judge Keith's statement that compensatory relief for incumbents would impose conflicting obligations on the Department. In my view, it would merely make compliance more expensive.
 
 
 104
 This Court has not been asked to review the merits of a judicial determination on the proposed intervenors' arguments. The proposed intervenors are not formal parties to this litigation, nor to any of the prior proceedings. Because Judge McRae never held a hearing on the merits, no issue has either been raised or preserved for appellate review beyond the timeliness of the motion to intervene itself. Having decided that the motion was untimely, Judge McRae had no jurisdiction to entertain the merits of the proposed intervenors' arguments. Neither does this Court. Nor has this Court been presented with the contention that the decree constitutes "reverse discrimination." I dissent from Judge Keith's sua sponte conclusion that the decree is "constitutional." I am disturbed by Judge Keith's lengthy discussion of the consent decree's validity and reasonableness vis a vis the proposed intervenors. In my view, this discussion is purely advisory, inappropriate in light of the conclusions I reach in my dissent in Stotts v. Memphis Fire Department, 679 F.2d 579, and most importantly, far beyond the scope of our appellate jurisdiction.
 
 
 105
 I offer one final observation on the majority opinion. The majority asserts that the proposed intervenors improperly asked the District Court to "restructure" the Memphis Fire Department. Judge Keith states that Judge McRae correctly denied this request, because he lacked such authority under National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). I find the majority's statement and citation ironic, given the fact that this Court today affirms the modification of the consent decree to prevent the City and the Department from following their standard seniority system in conducting layoffs. The irony of the majority's statement is particularly striking, read in light of the majority's conclusion that the Department should not have determined unilaterally to reduce the number of workers. According to the majority, "(a)lternative methods for meeting the crisis were available", and, presumably, should have followed.
 
 
 106
 This action was brought by the Attorney General against the City of Memphis to enforce the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972 (Pub.L. 92-261, March 24, 1972); the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1981. The Complaint sets forth certain allegations of the United States of America that the City of Memphis has engaged in a pattern or practice of discrimination based on race and sex in hiring and promotion within the City divisions, including the Memphis Light, Gas & Water Division. This Consent Decree resolves all issues raised by the Complaint with the City other than the employment practices of the Light, Gas & Water Division and the terms of this Decree do not apply to that Division. All issues raised by the Complaint regarding employment practices at the Light, Gas & Water Division remain outstanding.
 
 
 107
 The City of Memphis denies it has heretofore engaged in any pattern or practice of discrimination in hiring or promotion on the basis of race or sex but realizes that certain past practices of the City may have given rise to an inference that such practice may have occurred. The City states that it has made good faith efforts to rectify racial or sexual exclusion in City employment and that since January 1, 1972, it has substantially increased blacks and women in the Police Division and blacks in the Fire Division. The City states that for the purpose of avoiding any further inference of discrimination, it has heretofore taken certain steps to increase the availability of qualified black and female employees by transfer and promotion, training programs, and career ladder programs in City employment.
 
 
 108
 For the same purpose and with the same intent the City is now willing to agree to the entry of a consent decree providing for additional measures to be taken. Both parties wish to avoid the delay and expense of litigation and desire to insure that any disadvantage to blacks and females that may have resulted from any past discrimination in obtaining employment and advancement is remedied so that equal employment opportunity will be provided to all. The City of Memphis and the United States, by agreeing to the issuance of this order, waive a hearing and finding of facts and conclusion of law on all issues raised by the Complaint with respect to employment by the City except employment at the Light, Gas & Water Division and the parties have mutually agreed to the entry of the consent decree, which shall not constitute an adjudication or admission by the City of any violation of law or findings on the merits of this case.
 
 
 109
 IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
 
 
 110
 1. The Defendant City and its officials, agents and employees and all persons acting in concert with them in the performance of City functions shall not engage in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with the City of Memphis because of such individual's race or sex, it being understood that remedial actions and practices permitted by this Decree shall not be deemed discriminatory. Specifically, the Defendant City shall not fail or refuse to hire, promote, upgrade, train or assign any individual, discharge any individual or otherwise discriminate against an individual as an employee or applicant for employment with respect to compensation, terms, conditions or privileges of employment because of race or sex.
 
 
 111
 2. The provisions of this Decree are intended to cover all full-time employment with the City of Memphis, except that the goals and other affirmative relief established herein, including affected class relief, shall not apply to employment in the Memphis Transit Authority, the Memphis-Shelby County Health Department, the Memphis-Shelby County Planning Commission, the Memphis-Shelby County Airport Authority, the Memphis Housing Authority, the Board of Education of the Memphis City Schools, Memphis-Shelby County Public Library and the Memphis-Shelby County Hospital Authority, said organizations either being separate authorities or administered through the County of Shelby; and provided further that the provisions set forth in the succeeding paragraphs do not apply to part time employment unless the provision so states.
 
 
 112
 3. The purpose of this decree is to insure that blacks and women are not placed at a disadvantage by the hiring, promotion and transfer policies of the City, and that any disadvantage to blacks and women which may have resulted from past discrimination is remedied so that equal employment opportunities will be provided to all. The City has agreed that in determining whether that purpose has been achieved, an appropriate standard of comparison is the proportion of blacks and women in the Shelby County civilian labor force. The City, therefore, agrees to undertake as its long term goal in this decree, subject to the availability of qualified applicants, the goal of achieving throughout the work force proportions of black and female employees in each job classification, approximating their respective proportions in the civilian labor force. Except as otherwise provided in paragraphs 4, 10, and 15 below, the City shall, in meeting the long term goal for black employees, establish and attempt to meet an interim goal, in classifications where the long term goal has not been met, of filling at least 50% of all vacancies with qualified black applicants. The City in meeting the long term goal for women shall actively encourage female employees in clerical positions to seek transfer or promotion to those positions where the long term goal has not been met, and shall employ affirmative recruitment efforts for female applicants for those positions which are entry level classifications. Except as provided in paragraphs 4, 10, and 15, no specific interim numerical goals shall be established for women for the initial year of this Decree. After February 15, 1976, the parties shall meet with the City to determine appropriate interim goals for women for those job classifications in which the long term goal has not been met. In no event shall the City be required to hire unnecessary personnel, to hire, transfer or promote a person who is not qualified or to hire, transfer or promote a less qualified person in preference to a better qualified person, nor shall the City apply any standard for employment which does not validly measure qualifications for that position. Compliance with interim goals established pursuant to this decree shall be measured on an annual basis except where otherwise specifically provided.
 
 
 113
 4. The City shall, for those positions such as accountant and engineer which require a professional degree, establish and attempt to achieve an initial interim goal of filling 30% of the total vacancies in such positions with qualified black and/or female applicants. This level of this interim goal shall be reviewed by the parties after February 15, 1976, on the basis of performance of the City in the period and the availability of qualified black and female applicants in these professional areas.
 
 
 114
 5. (A) Insofar as the term "affected class" is used in the provisions of this Decree, it shall include:
 
 
 115
 (1) Incumbent black full-time employees hired prior to January 1, 1972, in the Public Works and Sanitation Division, and in the Park Commission, who are in pay grades 51-52-53-54-55, except for the positions of Zoo Keeper and Auto Inspection I and II, and to include service truck and wrecker operator, and all other black incumbent employees who are employed in positions considered classified which exist below grade 9 in the City's current pay plan.
 
 
 116
 (2) Female incumbent full-time employees in positions which are by job title or description clerical in nature.
 
 
 117
 The defendant agrees to furnish to the plaintiff within ninety (90) days after the entry of this decree a list of the members of the affected class by job classification and individual seniority date.
 
 
 118
 6. (a) The City shall, for all purposes of promotion, transfer and assignment, compute the seniority of a person in the affected class as defined in paragraph 5, as the total seniority of that person with the City.
 
 
 119
 (b) Except as otherwise provided in paragraphs 10 and 15 for filling vacancies in the Police and Fire Division and in supervisory positions, the following procedure shall be followed in filling vacancies under this decree:
 
 
 120
 (1) A member of the affected class shall be given the initial opportunity to fill any vacancy in the City where the person is the senior applicant who meets the minimum qualifications for the position. This preference is exercised at the written election of the applicant. An affected class member using this preference who successfully transfers to and holds a position, as defined in paragraph 8, shall be considered on the same basis as other applicants on subsequent bids, subject to 6(a) above.
 
 
 121
 (2) Where no affected class member seeks or is entitled to a vacancy as provided in (1) above, the vacancy shall be filled pursuant to the procedures set forth in the City's Civil Service Ordinance and in the City's labor memoranda subject to 6(a) herein and in a manner consistent with meeting the goals set forth in the decree.
 
 
 122
 7. All members of the affected classes shall be notified of the provisions of this Decree and specifically of the opportunity to transfer and/or promote to other positions when such vacancies occur and are posted for bid by the City Personnel Division. At least ten (10) days before any such vacancies are to be filled, notices of the vacancies shall be posted at each location and in each department where a member of the affected class is employed. Appointed positions listed under Charter Section 248(d), (e), (f), (g), and (h) are excluded from this posting requirement.
 
 
 123
 8. If a member of the affected class shall transfer or promote to a new position pursuant to paragraph 6(b)(1), the person shall be given a reasonable opportunity of up to ninety (90) days or up to six (6) months under Civil Service, as appropriate, to determine if he or she wishes to remain in the position or for the City to determine if he or she is able to perform the job. Should the person wish to relinquish the position, or the City determine that the person is not able to perform the job, the person may return to the previously-held position with the same pay as prior to transfer and without loss of seniority. Whenever such a person is determined by the City not to be qualified or capable of performing in the position, the City shall submit in its periodic reports to the United States a written statement detailing the basis for the person's removal from the position. It is agreed that nothing in this Decree shall require Defendant to keep an employee in any position after the trial period in which the employee cannot perform the assigned tasks as adequately as such tasks have generally been performed in the past or if the employee's work habits or attendance are inferior as compared with other employees doing similar work.
 
 
 124
 9. No member of the affected class who makes a lateral or downward transfer for the purpose of enhancing promotional opportunities, shall be paid at a lower rate than the rate for the job from which the person transferred, including any regular within grade increments the person would have received had the person remained on that job. A person utilizing rate retention pursuant to this paragraph who returns or is returned to the original job pursuant to paragraph 8, may utilize the right to rate retention on a subsequent transfer, provided, however, that this right to rate retention may not be exercised on more than three occasions. The right to rate retention shall continue until the person has reached that level in the new department or line of progression where the rate of pay is equal to or higher than that in the previously held job classification. A transferee shall lose this privilege of rate retention if the person refuses a promotion in the new line of progression or fails to bid on a higher rate job in the new department for which he or she is eligible.
 
 
 125
 The plaintiffs Carl W. Stotts and Fred L. Jones filed their complaints in this action on February 16, 1977 and June 19, 1979 against the Memphis Fire Department and other City of Memphis officials, alleging that the defendants are engaged in a pattern or practice of discrimination in hiring and promotions on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972 (Pub.L. 92-261, March 24, 1972); 42 U.S.C. § 1981 and 42 U.S.C. § 1983.
 
 
 126
 The parties wish to avoid the delay and expense of contested litigation and desire to insure that any disadvantage to minorities that may have resulted from past hiring and promotional practices be remedied so that equal employment opportunity will be provided to all.
 
 
 127
 The Court has jurisdiction over the parties and subject matter of this action.
 
 
 128
 The parties, by agreeing to the issuance of this order, waive a hearing and findings of fact and conclusions of law on all issues raised by the complaints, and the parties have mutually agreed to the entry of this Consent Decree. Defendants, by entering into this Consent Decree, do not thereby admit any violations of law, rule, or regulation with respect to the allegations made by plaintiffs in their complaints.
 
 
 129
 The Court having been fully advised and informed of the facts and circumstances, and good cause appearing therefore,
 
 
 130
 NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:
 
 I.
 EFFECT OF THE CONSENT DECREE
 
 131
 This Decree is entered into as a settlement of an existing dispute between plaintiffs and defendants as to appropriate and valid procedures for the hiring and promotion of Fire Department personnel for the City of Memphis. It also provides for specific, definable and good faith efforts to be made by defendants to achieve certain goals for employment of blacks. This Consent Decree satisfies and resolves all claims of plaintiffs and the class they represent of racial discrimination with respect to those matters set forth in the complaints and the previous orders of this Court.
 
 
 132
 This Decree is not intended to conflict with any provisions of the Consent Decree entered into on November 24, 1974 between the United States of America and the City of Memphis in Civil Action No. 74-286; rather this Decree is intended to parallel and supplement the relief provided in that Consent Decree.
 
 
 133
 Both plaintiffs and the class they represent shall seek no further relief for the acts, practices or omissions alleged in the complaints save to enforce the provisions of this Decree, thereby waiving the right to seek further relief.
 
 
 134
 Plaintiffs agree that this Consent Decree is fully binding individually and on the class they represent. Defendants agree that this Consent Decree is fully binding on each of them, each of their officers, agents, employees and successors, and all other persons acting in concert with them who have notice of this Decree.
 
 II.
 CLASS CERTIFICATION
 
 135
 Plaintiff Stotts brought this action as a class action, and in its order of May 4, 1978, the Court certified the plaintiff class. For purposes of this Decree, the Court hereby adopts the class description set forth in that order with modifications as follows:
 
 
 136
 The class in this case consists of all incumbent black employees of the Memphis Fire Department, all those black employees who will be employed there in the future, and all black persons who have been denied employment with the Memphis Fire Department since March 24, 1972.
 
 
 137
 This action was brought, insofar as is relevant to this section of the Decree, on the basis of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and 42 U.S.C. §§ 1981 and 1983. For purposes of this settlement alone, and for no other purposes, the Court is satisfied that the above class should be and hereby is certified as proper under Federal Rule of Civil Procedure 23(b)(2) for injunctive, declaratory and back pay relief, and under Federal Rule of Civil Procedure 23(b)(3) for purposes of recovery of compensatory or punitive damages, if any.
 
 III.
 GENERAL
 
 138
 1. Defendants are compelled by law and by entering into this Consent Decree acknowledge their obligation to, and agree that they shall, refrain from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the Memphis Fire Department because of such individual's race or color. Defendants in addition acknowledge their duty under law to and agree that they shall, refrain from discrimination at any time on the basis of race in hiring, promotion, upgrading, training, assignment or discharge or otherwise discriminating against an individual employee or applicant for employment with respect to compensation, terms and conditions or privileges of employment because of such individual's race. The City shall take reasonable steps to assure that no member of the Fire Department interferes with the enforcement of this decree by any means. The acknowledgments set forth in this paragraph do not create a right or rights in any person or groups of persons to seek relief under this Decree for defendants' failure to comply with their general legal obligations as described in this paragraph, except for conduct which constitutes a pattern or practice of unlawful discrimination on the basis of race.
 
 
 139
 2. In the event the entry of this Consent Decree generates, either through intervention or separate, collateral lawsuits, attacks on the appropriateness or sufficiency of any of the provisions contained herein, to include actions claiming entitlement to damages against the City as a result of the ordering of any of the affirmative relief contained in this Decree, the parties hereto agree and warrant that they shall defend the lawfulness of any provision or provisions so attacked. If any such collateral lawsuit arises in state court against the City, it shall seek to remove such action to the Federal District Court.
 
 IV.
 SELECTION PROCEDURES
 
 140
 3. The City shall continue to develop and reassess its present affirmative recruitment program to inform minorities of job opportunities with the Memphis Fire Department. In filling vacancies in the entry level position, the City shall continue to emphasize recruitment from among qualified members of the affected class, as provided in the Consent Decree in CA-74-286.
 
 
 141
 4. The City may maintain their current or similar education standards and selection procedure for firefighters, provided, however, that these standards and procedures do not have an adverse impact on members of the affected class as measured by compliance with the interim hiring goal set out in paragraph 7 below. If such impact is shown, the City must demonstrate the job relatedness of the particular education standard or selection procedure.
 
 
 142
 5. The City may continue to use on a pass-fail basis (or other grading system authorized by the U. S. Department of Justice provided that no adverse racial impact is present) written promotional examinations for the Fire Department. However, the City shall evaluate these examinations and promotional testing procedures to insure that the use of these examinations will not have an adverse impact on black applicants. The parties agree that adverse impact will be shown if the adverse differential in the failure rate for blacks is in excess of five (5) percent. The City shall maintain records of the results of all such examinations sufficient to determine the impact on black applicants and shall provide this information to plaintiffs' attorney at the same time as the information is submitted to the United States Department of Justice in accordance with the Consent Decree in CA-74-286.
 
 
 143
 The City also agrees that it will administer promotional examinations on a regular basis, but in any event, at least every two years. The City shall notify plaintiffs' counsel of plans to administer promotional examinations as soon as practicable after the decision has been made on such plans.
 
 V.
 GOALS
 
 144
 6. The purpose of this decree is to remedy the past hiring and promotion practices of the Memphis Fire Department with respect to the employment of blacks and continuing the efforts made in the City in hiring and promotions under the consent decree entered in CA-74-286. In achieving that purpose, it is the intent of the parties to work within the arrangements established between the Department of Justice and the City of Memphis in that consent decree. In that regard the parties agree that the long term goal established in this decree shall be that set forth in CA-74-286, viz. that the goal shall be to raise the black representation in each job classification on the fire department to levels approximating the black proportion of the civilian labor force in Shelby County. Goals established herein are to be interpreted as objectives which require reasonable, good faith efforts on the part of the City, and not as rigid quotas.
 
 
 145
 7. Hiring: The City shall, in meeting the long term goal for black employees, establish and attempt to meet an interim goal, in entry level classifications where the long term goal has not been met, of filling on an annual basis at least 50% of all vacancies with qualified black applicants. Based on the experience with prior academy classes, the parties expect that the interim hiring goal above will be met both at time of initial appointment and successful completion of academy training. If any classes of firefighters hired pursuant to this order experiences a disproportionate rate of attrition among black firefighters, the parties shall meet promptly to determine the reason therefor, and to discuss methods or remedying the unbalance so that achievement of the long-term goal can be facilitated.
 
 
 146
 8. Promotion: To insure as quickly as practicable the attainment of its long range goal, the City agrees to the following interim goals, subject to the availability of qualified applicants:
 
 
 147
 (a) The City adopts the goal of promoting Black applicants to positions above the rank of private or other entry level job classification in proportion to their representation in the qualified applicant pool for each uniformed-rank or civil service classification. The parties agree to a goal of promoting blacks in the proportion of at least 20% for each civil service classification or uniformed-rank as measured on an annual basis; the parties recognize that the number of blacks qualified for a particular job rank or classification may be a relevant factor in measuring the City's compliance with these goals. Nothing in this paragraph or Decree should be construed in such a way to require the promotion of the unqualified or the promotion of the less-qualified over the more qualified as determined by standards shown to be valid and nondiscriminatory as set forth in the Uniform Guidelines on Employee Selection Procedure, 28 C.F.R. 50.14.
 
 
 148
 (b) During periods when acting positions are available, these non-permanent assignments from the next lower rank in the uniformed force shall be based on experience and demonstrated ability, for the position to which the employee shall be assigned and, consistent with the foregoing, reasonable efforts shall continue to be made to give leadership experience to eligible blacks.
 
 VI.
 SPECIFIC RELIEF
 
 149
 9. Promotions: The promotions listed in Exhibit A to this Decree shall become effective upon the entry of this decree. The conditional promotions shall become effective upon fulfillment of each condition listed in Exhibit A.
 
 
 150
 10. Monetary Relief : The parties to this Decree have agreed that the aggregate monetary relief in this case shall be $60,000 of which all shall be considered back pay. This money shall be awarded pursuant to the amounts listed in Exhibit B with the City to prepare individual checks within 15 days (or as soon as practical utilizing good faith efforts) of the final entry of this decree and delivered to plaintiffs' counsel for distribution. All persons who receive monetary relief herein shall execute a release in the form attached as Exhibit C as a condition of payment.VII.
 
 REPORTING
 
 151
 11. The City shall maintain and retain during the period of this decree necessary records to support the implementation of this decree which shall be the same records kept for implementation of the Consent Decree in CA-74-286. These records shall be made available to the plaintiffs' counsel for inspection and copying upon written request and where applicable subject to an appropriate protective order.
 
 
 152
 To avoid conflicts with the Attorney General's continuing monitoring and compliance efforts pursuant to the Consent Decree in CA-74-286, the parties agree to the following provisions:
 
 
 153
 (a) The City will furnish to Plaintiffs' counsel copies of all reports relating to the Fire Division made to the Attorney General pursuant to the Consent Decree in CA-74-286.
 
 
 154
 (b) Should any dispute or controversy arise concerning the Defendants' application of, or adherence to, the provisions of this decree, Defendants' and Plaintiffs' counsel shall confer with the Attorney General and seek a mutually agreeable resolution of the disputes.
 
 
 155
 (c) Should voluntary efforts to resolve the dispute or controversy fail, Plaintiffs' counsel may then petition the Court for redress or resolution.
 
 
 156
 12. The City will maintain the following records:
 
 
 157
 (a) All applications and related records for all persons seeking employment or promotions with the Memphis Fire Department and shall include on such applications identification of the applicant by race. The records retained shall include, where applicable, copies of tests administered and the test results.
 
 
 158
 (b) All written communications between the City and applicants for both initial entrance, transfer and promotion.
 
 
 159
 13. At the times established for such reports to the Attorney General in CA-74-286, the City shall report to plaintiffs' counsel the following information:
 
 
 160
 (a) A summary showing the total number of employees by race in each job classification of the Memphis Fire Department.
 
 
 161
 (b) A list of all newly hired employees indicating the name, race, and job classification of each since the last report was filed.
 
 
 162
 (c) A list of all persons, by job classification, to whom promotion has been offered and whether or not that promotion has been accepted.
 
 
 163
 (d) A breakdown of the applicant flow of the Memphis Fire Department by race which indicates the number of applicants by race, rejected and pending for each job classification. A person is considered an applicant for this purpose upon filing a formal application when a job is posted and upon meeting the minimum qualifications for the position.
 
 
 164
 (e) A list of all promotions, name, race, and date of hire of the employee promoted and the date of the promotion.
 
 
 165
 14. The City shall provide counsel for the plaintiffs a copy of each of the following documents relating to the Fire Division at the times established for reporting to the Attorney General pursuant to the Consent Decree in CA-74-286:
 
 
 166
 (a) each eligibility list for hiring or promotion to any rank in the department identifying each individual on said list by name and race;
 
 
 167
 (b) each new or revised job description or classification;
 
 
 168
 (c) notice of the filling of vacancy in any uniformed or non-uniformed position within the Fire Department including the name and race of the person selected.
 
 VIII.
 MISCELLANEOUS
 
 169
 15. Attorneys' Fees and Costs. The City shall pay counsel for plaintiffs, attorneys' fees and costs in the amount of $ in settlement of all claims by said counsel for attorneys' fees from the commencement of this action to the entry of this Decree and such amount shall be paid within 15 days of the final entry of this Decree. (The parties have followed the recommendation of Prandini v. National Tea Co., 557 F.2d 1015, (3d Cir. 1977) and will begin to negotiate the possible settlement of fees and costs after the Court's preliminary approval of this Consent Decree.)
 
 
 170
 16. If any provision of this Decree causes a result unintended by all the parties or an ambiguous interpretation, the aggrieved party shall notify the other parties and the Attorney General by mail of the unintended result or ambiguous interpretation. The parties shall have 30 days after the date of such letter to resolve the problem. If the parties are unable to reach agreement within such 30 days, the issue may be submitted to the Court for resolution.
 
 
 171
 17. The Court retains jurisdiction of this action for such further orders as may be necessary or appropriate to effectuate the purposes of this decree.
 
 
 172
 18. Notice. The Court hereby gives its tentative approval to this Consent Decree, subject to the notification of class members and the provision of an opportunity for them to file objections. The text of the notice to be is set forth in Exhibit D. This notice shall be posted at each firehouse or other Bureau facility of the Fire Department for a period of 15 days beginning April 28, 1980, and mailed to each identified class member listed in Exhibit B on that date. Class members who file written objections within this period shall be entitled to be heard on their objections at a hearing before this Court on May 16, 1980. If no written objections are filed within the 15 day period, this Consent Decree shall become final without further action by the Court.
 
 
 173
 ENTERED, this 25th day of April, 1980.
 
 
 174
 /s/ ROBERT M. McRAE, JR.
 
 
 175
 /s/ UNITED STATES DISTRICT JUDGE
 
 APPROVED:
 
 176
 /s/ RICHARD B. FIELDS
 
 RICHARD B. FIELDS
 RATNER & SUGARMON
 ATTORNEYS FOR PLAINTIFFS
 
 177
 /s/ CLIFFORD D. PIERCE, JR.
 
 
 178
 CLIFFORD D. PIERCE, JR.
 
 EDWARD R. YOUNG
 J. DANIEL MORGAN
 ATTORNEYS FOR DEFENDANTS
 MEMPHIS FIRE DEPARTMENT
 FIRE FIGHTING CLASS
 
 179
 (Data derived from inspection of
 
 
 180
 class pictures at the Memphis Fire
 
 Department Training Center)
 
 181
 DATE BLACK WHITE
 ---- ----- -----
10-25-50 0 12
1-2-51 0 36
2-20-51 0 15
6-17-51 0 16
12-5-51 0 10
2-4-52 0 17
4-15-52 0 13
9-24-52 0 20
1-5-53 0 14
3-23-53 0 12
6-15-53 0 12
10-26-53 0 16
2-5-54 0 23
6-14-54 0 14
1-3-55 0 21
7-11-55 16 12
7-18-55 0 10
1-3-56 0 28
4-9-56 0 26
10-29-56 0 34
3-11-57 0 40
10-27-58 0 30
5-11-59 0 24
11-30-59 0 30
5-9-60 0 18
7-18-60 0 17
10-17-60 0 19
3-6-61 0 46
11-20-61 0 37
2-15-62 0 43
7-9-62 0 30
12-17-62 0 30
10-7-63 0 28
10-5-64 1 32
1-18-65 0 50
12-13-65 3 40
3-7-66 1 55
7-18-66 0 33
7-3-67 1 50
7-16-68 4 38
10-1-68 3 69
3-17-69 1 71
5-1-69 5 66
8-25-69 5 88
11-3-69 5 102
6-28-71 2 18
6-5-72 11 40
9-5-72 7 38
10-30-72 8 42
1-2-73 11 28
9-24-73 5 46
9-30-74 3 25
9-26-77 43 30
 
 
 
 *
 Hon. Robert M. Duncan, U. S. District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 § 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [2]
 See appendix page 570
 
 
 [3]
 § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and Laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.
 
 
 [4]
 According to the proposed intervenors, constructive promotions would occur whenever a minority and non-minority candidate were equally qualified for a position but the minority got the position. The minority would obtain the title, responsibility, and pay for the promotion while the non-minority would receive the pay as a constructive promotion
 
 
 [5]
 Between 1950 and 1976, the Memphis Fire Department hired 94 black and 1683 white firemen. Promotions within the Fire Department between the years of 1969 and 1975 were as follows:
 MEMPHIS FIRE DEPARTMENT
 PROMOTIONS
 1969 Black White
Lieutenant 1 17
 1970 Black White
Driver 1 60
 1971 Black White
Driver 1 13
Lieutentant 0 15
Captain 0 1
 1972 Black White
Drivers 2 128
Lieutenant 1 57
Investigator -- Lieutenant 0 6
Captain 0 2
 1973 Black White
Investigator -- Captain 0 5
Captain 0 3
Emergency Unit -- Lieutenant 0 4
 1974 Black White
Driver 1 39
Lieutentant 0 21
 1975 Black White
Driver 0 8
Lieutenant 0 5
Captain 0 2
 In 1979, blacks constituted between 33 and 37 percent of the Memphis population. However, the Fire Department was only 10 percent black. The past hiring and promotional policies of the City of Memphis caused the Fire Department to exhibit the following racial characteristics in 1979:
 BLACK WHITE
 I. ADMINISTRATION
 Senior Account Clerk 0 2
 Accountant 0 1
 Clerk Typist 0 1
 Senior Clerk Typist 1 6
 Stenographer 1 1
 Secretary 0 4
 Executive Secretary 0 1
 Personnel Lieutenant 0 1
 Master Plans Coordinator 0 1
 OSHA Coordinator 0 1
 Manager -- Fire Personnel 0 1
 Administrative Assistant 0 1
 Administrative Chief 0 1
 Deputy Director 0 2
 Director 0 1
 --------- ----------
 Total 2 25
 II. APPARATUS MAINTENANCE
 Vehicle Serviceman 2 0
 Preventive Maintenance
 Repairman 4 3
 Fire Maintenance Mechanic 0 21
 District Chief 0 2
 --------- ----------
 Total 6 26
 III. MATERIAL SERVICES
 Storage Keeper 0 1
 Crewman 8 2
 Building Maintenance
 Supervisor 0 1
 Manager 0 1
 --------- ----------
 Total 8 5
 IV. AIR MASK SRV
 Hydrant Repairman 0 4
 V. TRAINING & WATER
 Lieutenant 0 6
 Captain 0 1
 --------- ----------
 Total 0 7
 VI. COMMUNICATIONS
 Fire Alarm Operator I 1 4
 Fire Alarm Operator II 1 8
 Fire Alarm Operator III 1 21
 Senior Fire Alarm Operator 0 7
 Fire Maintenance Electrician 0 5
 Watch Commander 0 3
 Manager 0 1
 District Chief 0 1
 --------- ----------
 Total 3 50
 VII. FIRE PREVENTION
 Home Fire Safety Representative 5 3
 Parts Assistant 0 1
 Master Plans Coordinator 0 1
 Fire Inspector 1 19
 Fire Investigator 2 2
 Manager 0 1
 Fire Prevention Supervisor 0 3
 Fire Safety Ed. Coord. 0 1
 Deputy Fire Marshall 0 3
 Assistant Fire Marshall 0 1
 Fire Marshall 0 1
 --------- ----------
 Total 8 37
VIII. FIRE FIGHTING
 Fire Private I 0 (13) 7 (31)
 Fire Private II 100 (71) 594 (504)
 Driver 8 (15) 281 (296)
 Lieutenant 2 (29) 215 (211)
 Captain 1 (2) 73 (82)
 Air Crash Chief 0 1
 District Chief 0 20
 Deputy Chief 0 4
 --------- ----------
 Total 111 1195
 IX. AMBULANCE SERVICE
 Emergency Unit Operator 7 82
 Emergency Unit Lieutenant 0 6
 District Chief 0 1
 --------- ----------
 Total 7 89
 (As of May 8, 1981)
 In Teamsters v. U. S., 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, the Supreme Court stated statistics indicating racial imbalance are often "a telltale sign of purposeful discrimination." It is ordinarily expected that nondiscriminatory hiring practices will in time result in a workforce more or less representative of the racial composition of the city. Id. at 340, n.20. In the spring of 1981, blacks constituted only 11 percent of the Memphis Fire Department. Approximately 35 percent of the City of Memphis is black. The statistics contained in this record represent a very strong prima facie case of employment discrimination.
 
 
 [6]
 The district court erred in ruling that the seniority system was non-bona fide. The district court found that the layoff policy was not adopted with a discriminatory purpose. That finding has not been challenged on appeal. See Taylor v. Mueller Co., 660 F.2d 1116, 1122 (6th Cir. 1981). The district court did find that the layoffs would have a disparate impact on minority employment
 
 
 [7]
 We express no opinion on the adequacy of the notice afforded by the posting procedure utilized in this case. No objections were made to the posting procedure either in the district court or on appeal. Accordingly, we do not address the notice issue
 
 
 [8]
 The better practice is to determine that the decree is not the product of collusion before the decree is preliminarily approved
 
 
 [9]
 The effects of discriminatory pre-Act and post-Act employment practices may be remedied by an affirmative action plan embodied in a consent decree. See Detroit Police Officers Association v. Young, 608 F.2d 671 at 689
 
 
 [10]
 The statistical imbalance need not be so great as to constitute a prima facie case. See Setser v. Novack Investment Co., 657 F.2d 962, 968 (8th Cir. 1981); Detroit Police Officers Association, 608 F.2d at 689, 690 (6th Cir.). In the context of consent decrees providing affirmative action relief, we interpret the disclaimer of wrongdoing to be an admission that there is a statistical disparity which the defendants cannot unequivocally explain, together with a reservation of the right to attempt to explain it at any other time. See United States v. City of Alexandria, 614 F.2d 1358 at 1365 n.15 (5th Cir.)
 
 
 [11]
 "Settlement agreements should ... be upheld whenever equitable and policy considerations so permit. By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before overburdened courts, and to citizens whose taxes support the latter. An amicable compromise provides the more speedy and reasonable remedy for the dispute." Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976)
 
 
 [12]
 An employer, such as the City, is unlikely to have an over-compromising attitude toward affirmative action. Employers recognize, as does the dissent, that an inequitable or overly zealous affirmative action plan may create racial tension in the workplace. The presence of this tension may create dissension and a general non-productive work climate. This unfortunate, but real potential for non-minority backlash is a potent disincentive which restrains employers from agreeing to "too" sweeping affirmative action. However, it is doubtful that this backlash is any less counter-productive than that created by perpetual discriminatory employment policies. More significantly, however, such considerations cannot justify failure to sustain an otherwise reasonable consent decree
 
 
 [13]
 Statistical evidence of racially disparate impact may establish a statutory violation of Title VII. See Detroit Police Officers Assoc., 608 F.2d at 686; International Brotherhood of Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). Under some circumstances such evidence could demonstrate a constitutional violation. See Village of Arlington Heights v. Metropolitan Housing Corporation, 429 U.S. 252, 266 and n.13, 97 S.Ct. 555, 564 and n.13, 50 L.Ed.2d 450 (1972)
 
 
 [14]
 This court assumes the rate of minority participation in the labor force equals the percentage of minorities in the Memphis community
 
 
 [15]
 If a violation had been established, the remedy would have embodied retrospective as well as prospective relief. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1974)
 
 
 [16]
 Absent extraordinary circumstances, the court should act only on the motion of the parties
 
 
 [17]
 We express no opinion on whether the goals contained in the instant decree should be increased at the conclusion of the unanticipated economic crisis in Memphis
 
 
 [18]
 See Footnote 5
 
 
 [19]
 We note that this court has previously endorsed the analysis of Rule 60(b) in Philadelphia Welfare Rights Org'n., 602 F.2d at 1120-21:
 Any injunction imposing mandatory affirmative duties for the future involves elements of prediction. Whether the prediction as to achievability is made as a result of litigation or, as here, in a negotiated settlement, it will always be speculative to some degree. This is particularly the case when the defendants' ability to achieve compliance depends upon the receptivity of class members or other third parties not formally before the court. See Special Project, the Remedial Process in Institutional Reform Litigation, 78 Col.L.Rev. 784, 818-19 (1978). An approach to the modification of a complex affirmative injunction which over-emphasized the interest of finality at the expense of achievability would inevitably make defendants wary of any decree imposing more than the bare minimum of affirmative obligation. That wariness would, we think, tend to discourage the settlement of injunction actions by consent decree, a high price to pay for benefits of finality. Even where the decree is litigated, if the power to modify were too closely curtailed the defendants might seek, and the courts might tend to impose, minimum affirmative obligations, perhaps less than realistically achievable, for fear of becoming bound by unreasonable but unchangeable requirements. Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in light of experience.
 
 
 [20]
 Plaintiffs contend that Teamsters is inapposite because the collective bargaining agreement between the City and the firemen is void and unenforceable under Tennessee law. See Keeble v. City of Alcoa, 204 Tenn. 286, 319 S.W.2d 249 (1958). Consequently, the trial court's modification of the layoff procedure did not violate a valid collective bargaining agreement. We need not, and do not decide this issue
 Plaintiff has also attempted to distinguish Teamsters by raising the issue of whether Firefighters Local Union 1784, a union formed after the effective date of Title VII, can be bona fide. This issue is before the Supreme Court. See Patterson v. American Tobacco Co., 634 F.2d 744, (4th Cir. 1980), cert. granted, 452 U.S. 937, 101 S.Ct. 3078, 69 L.Ed.2d 951, vacated and remanded, --- U.S. ----, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1981). We, therefore, do not decide this issue.
 
 
 [21]
 Circuit Judge Brown and District Judge Wiseman took a contrary view in Brown, supra. It also appears that Circuit Judge Martin also disagrees with my view. I have taken this opportunity to fully explain my position and the substantial case authority in support of it